**BISCEGLIA BROS. CORPORATION v. FRUIT INDUSTRIES, LIMITED.**

No. 9675.

District Court, E. D. Pennsylvania.
Sept. 17, 1937.

Herman H. Krekstein, of Philadelphia, Pa., for plaintiff.

Benjamin M. Golder, of Philadelphia, Pa., for defendant.

WELSH, District Judge.

This suit was brought by the plaintiff to restrain the defendant from interfering with the sale by the plaintiff in Pennsylvania of beverage wine under the trade mark "Greystone." The facts are complicated and the evidence voluminous, but the circumstances essential to the determination of the issue may be briefly summarized.

Since the repeal of prohibition in December, 1933, the plaintiff corporation and its predecessors, trading under the same name, have been selling "Greystone" wine to the Pennsylvania Liquor Control Board for distribution through its 500 or more state liquor stores, the only agency through which such distribution may be made in this state. The wine so branded includes virtually all types of still wines and is purchased by the plaintiff from Bisceglia Bros., a California partnership of the same name but having no connection or affiliation with the plaintiff corporation. The sales to the board amounted to $338,620.45 in 1934, increasing to $630,229.32 in 1936, and totaling $1,345,707.61 during the three years. Plaintiff has during the same period advertised and promoted the sale of "Greystone" wines by the expenditure of $117,668.28. Ninety per cent. of the plaintiff's business consists of sales to the Pennsylvania Liquor Control Board and it is estimated that about thirty per cent. of the wine sold in the state is the plaintiff's "Greystone" brand. In addition to the adoption of the trade-mark "Greystone" at about the time of repeal, and its continued uninterrupted use thereafter, the plaintiff on February 6, 1936, registered the name under the state law as its trade-mark.

On January 25, 1937, the defendant, by its counsel, notified the Liquor Control Board by letter that it claimed exclusive right to the trade-mark "Greystone," and that the plaintiff was unlawfully using the same. The board, in order to avoid any possible liability resulting from the purchase and distribution of the plaintiff's product, because of the alleged infringement, discontinued further purchases from the plaintiff until March 5, 1937, when satisfactory indemnity arrangements were made, pending the outcome of the dispute. Defendant on February 5, 1937, also notified the plaintiff of its claim and demanded that the plaintiff cease all further use of the trade-mark. Such notices and demands adversely affected the plaintiff's business between January 25 and March 5, 1937.

The defendant's claim to the trade-mark arises from the following circumstances: California Wine Association, prior to 1910, purchased the Greystone Winery, a plant which had become a familiar landmark at St. Helena, Napa county, Cal. That association thereafter used the name "Greystone" to identify certain light dry wines which were to some extent peculiar to that district. On January 9, 1911, the California Wine Association secured the registration in the Patent Office of the trade-mark "Greystone" for a hock type wine, claiming the use of the name since 1895. The registration and all other assets of the California Wine Association were thereafter assigned to the defendant, a co-operative association and the registration was renewed in 1931 and held in the defendant's portfolio of trade-marks, pending the advent of repeal.

Between 1911 and 1914 the California Wine Association had attempted to promote the sale of domestic bottled wine, with little success and with comparatively few sales in Pennsylvania. At that time the greatest volume of wine business was done in bulk goods which were bottled by the purchaser under his own brand, and only a negligible quantity of Greystone was sold prior to prohibition in 1920. After prohibition the defendant contacted the Pennsylvania Liquor Control Board with the view to selling its "Constitution" and "Olympic" brands of wine but making no offer of "Greystone." Defendant, however, declined to sell to the board due to the board's credit terms. It is admitted that the defendant had knowledge early in 1934 of the sale of the plaintiff's "Greystone" wines in Pennsylvania through the state stores.

The old Greystone Winery had been sold by the defendant in 1925 to Bisceglia Bros., the California partnership, and was used by them until 1933 for storage pur-

poses. Thereafter Bisceglia Bros. used it for production and have since then supplied the plaintiff with bulk wine which has been bottled and sold by the plaintiff under the "Greystone" trade-mark. On September 19, 1933, Bisceglia Bros., the California partnership, registered the trade-mark "Greystone" in the Patent Office. They manufactured and sold wine under that name, and made no objection to the use of the same mark by their customer, the plaintiff, until May or June, 1936. This registration was, however, canceled at the instance of the defendant in an uncontested proceeding before the Patent Commissioner. Defendant also sought to enjoin the use of the trade-mark by the Bisceglia Bros. partnership in an equity proceeding in California, which resulted in an agreement dated October 9, 1936, in which the Bisceglia Bros. partnership gave up to the defendant all their rights to and interest in the trade-mark "Greystone," including the plaintiff's registration of the name in Pennsylvania, despite the fact that they had no interest in such Pennsylvania registration. Prior to that agreement the Bisceglia Bros. partnership had complained to the plaintiff of its use of the trade-mark, but, in a letter dated July 22, 1936, they had acknowledged the prior use by the plaintiff in Pennsylvania, and abandoned to the plaintiff any rights which they had previously claimed in this state.

The question presented is whether under these circumstances the defendant has the exlusive right to the use of the trade-mark "Greystone" in Pennsylvania, and is lawfully entitled to interfere with the sale of the plaintiff's "Greystone" wines to the Pennsylvania Liquor Control Board. Have the rights of the parties been affected by the extent of the use of the trade-mark; did the conduct of the defendant indicate an abandonment; and is the defendant estopped from asserting its claim to the trade mark in Pennsylvania? These are the issues incidental to the determination of the case, and will be discussed at some length.

The validity of the defendant's registration of the trade-mark "Greystone" for a hock type wine is not questioned, nor is there any evidence of infringement prior to 1920. We may also concede the legality of the plaintiff's registration in Pennsylvania. But the effectiveness of such registrations is dependent upon the use of the names registered and the equities of the respective parties as they may have been affected by such use and the conduct of the claimants. The issue raised is of great importance to both parties and the subject matter of such value that we deem it necessary to review the principles of law and equity pertinent to the facts.

Trade-marks and the rights of the owners have always been recognized at common law, regardless of the existence or provisions of registration acts. The certificate of registration is proof of adoption but is not intended to be conclusive as to the validity of the mark, and the fact of registration or nonregistration does not affect the jurisdiction of the courts to determine the validity of the act of appropriation. Fraim Lock Co. v. Shimer, 43 Pa.Super. 221. The exclusive right to the use of a trade-mark is founded upon priority of appropriation, McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828, and the purpose of a trade-mark is to identify the origin or ownership of an article of trade so that purchasers may recognize the goods so marked. Other owners or producers are prohibited from the use of the mark because such use would deprive the maker of the goods of the profit and good will incident to the sale of his product, Hanover Star Milling Co. v. Metcalf (Allen & Wheeler v. Hanover Star Milling Co.), 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713.

The exclusive ownership of a trade-mark exists only as an appurtenance to a particular business or trade with which it is connected, and is established by the use rather than by its mere adoption or registration. The trade-mark right is not limited by territorial bounds, but this is true only in the sense that wherever the particular trade goes, attended by the use of the mark, the rights of the trade-mark owner will be protected. United Drug Co. v. Theodore Rectanus, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141. The right frequently extends over a large area, depending upon the character of the business and the manner of use of the mark with the view to attracting customers. Hanover Star Milling Co. v. Metcalf, supra.

The law of trade-marks is part of the law of unfair competition, and there are many cases involving the unlawful use

of trade-marks by persons other than those entitled thereto by prior use. The wrong usually complained of is the sale, or possible sale, of the goods of one vendor or producer for those of another, with the attendant loss of business by the person entitled to it. There are many other cases involving the independent use of the same mark by competing parties at the same time and raising an issue as to their exclusive or respective rights.

The general rule is that, where two competing parties claim rights to the same trade mark, priority of appropriation determines the question as to who is entitled to the mark. McLean v. Fleming, supra; Amoskeag Mfg. Co. v. Trainer, 101 U.S. 51, 25 L.Ed. 993. The reason for the rule is that purchasers are presumed to have known the mark as an indication of the origin of the goods so that the use of the mark by the competitor amounts to an attempt to sell his goods as those of the original producer. The reason for such rule would not apply, however, where the same trade-mark is employed simultaneously by two manufacturers in different markets, entirely separate and remote from each other, so that the mark means one thing in one market and an entirely different thing in another. Sweet Sixteen Co. v. Sweet "16" Shop, Inc. (C.C.A.) 15 F.(2d) 920. In such cases the question of prior appropriation is legally unimportant, unless it is shown that the second user of the mark has adopted it with the view to injuring the business of the first user, or to take the benefit of the reputation of his goods. Hanover Star Milling Co. v. Metcalf, supra. But, where they are innocently using the same trade-mark in separate markets, and neither is trading on the good will of the other, there may be no conflict in fact, and therefore no wrong done which would call for legal redress.

The present circumstances show that the defendant used the trade-mark in question to a limited extent many years ago, and not in Pennsylvania subsequent to 1920, while the plaintiff has extensively distributed its goods in this state continuously since December, 1933. We must therefore determine whether under all the circumstances incident to such facts there has been an abandonment of the trade-mark by the defendant. We affirm at the outset that the disuse of a trade-mark due to a statutory prohibition of the sale of the article to which it is attached is not in itself an abandonment.

It is well settled that, although trade-mark rights have been created by proper adoption and use, they may also be lost by abandonment, nonuser, laches, or acquiescence, and the claimant may be estopped from asserting such rights. Abandonment rests upon intent, in addition to acts indicating the fact (Saxlehner v. Eisner & Mendelson. Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60; DuPont Cellophane Co. v. Waxed Products Co. (D.C.) 6 F. Supp. 859), and, as to laches and acquiescence, it has been held that, where the defendant acted fraudulently or with knowledge of the plaintiff's right to the name, and the plaintiff delays or acquiesces in the unlawful use, the plaintiff may be entitled to injunctive relief but not to accounting and damage, McLean v. Fleming, supra; Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526. The averment of abandonment through acquiescence in the use of a trade-mark by others must be established by proving the infringing use and also the existence of elements of an equitable estoppel (Menendez v. Holt, supra), while laches is based on the inequitable conduct of the trade-mark claimant and the inequity to the other user which would result if the claim were to be enforced. It exists where the party to whom laches is imputed has knowledge of his rights and an opportunity to protect them, but who, by reason of his delay, has given the other party reason to believe that there has been an abandonment, and has permitted a change in conditions such as would render it unjust to permit him to assert his claim to the exclusive use of the mark. Richardson v. D. M. Osborne & Co. (C.C.) 82 F. 95.

The failure of a claimant during a long period to assert and enforce his rights and his essential disregard of the extensive use of the mark, while a large and valuable competitive business grew up about it, is proof of an intent to abandon. McKesson & Robbins, Inc. v. Charles H. Phillips Chemical Co. (C.C.A.) 53 F.(2d) 342; France Milling Co. v. Washburn-Crosby Co. (C.C.A.) 7 F.(2d) 304. The continued, persistent, and adverse use of a trade-mark by others, with the knowledge of the first claimant, shows an abandonment of the exclusive claim to the mark. Where, by reason of such

abandonment, new rights have arisen due to such adverse use, it would be inequitable to restrain the subsequent users. Pflugh v. Eagle White Lead Co. (C.C.A.) 185 F. 769. It is incumbent upon the claimant to act with due diligence, for, where he fails by efforts which are reasonable in time and extent to project his business into the territory where another producer is using the same trade-mark, he will be denied equitable relief. He cannot because, of mere ownership of the name, pre-empt the territory forever. Jacobs v. Iodent Chemical Co. (C.C.A.) 41 F.(2d) 637. It would be a perversion of the rule as to priority to hold that an innocent party who had in good faith employed a trade-mark in one state, and by its use built up a valuable business, and being the first user in that state, should be prevented from using it, with the consequent 'destruction of his trade and good will, upon the complaint of a prior user of the mark in other and remote markets, merely on the ground that the first use antedated that of the innocent second adopter. Sweet Sixteen Co. v. Sweet "16" Shop, Inc., supra; United Drug Co. v. Theodore Rectanus, supra.

It does not seem essential that the plaintiff must have an absolute and exclusive right to the trade-mark in order to grant the protection necessary to preserve its rights. The defendant may be enjoined, although he also may be entitled to the use of the same mark, where the defendant uses it in such a way as to injure the plaintiff. It does not seem incompatible with any principle of law or equity to say that each of the parties may have and enjoy equal rights to separate and distinctive uses of the same trade-mark. The courts have recognized such rights by claimants in different parts of the country, Tillman & Bendel, Inc. v. California Packing Corp. (C.C.A.) 63 F. (2d) 489; Thomas G. Carroll & Son Co. v. McIlvaine & Baldwin (C.C.) 171 F. 125, affirmed (C.C.A.) 183 F. 22, and also for the use of the same mark on different products of the same general class, Treager v. Gordon-Allen (C.C.A.) 71 F.(2d) 766; White Rock Mineral Springs Co. v. Akron Beverage & Cold Storage Co. (C. C.A.) 299 F. 775.

The legal principles being thus established, they may readily be applied to the circumstances of the present case. We note first that the plaintiff is not seeking to assert an exclusive right to the trade-mark "Greystone" nor is it denying any rights of the defendant acquired by prior use and registration. It merely seeks to prevent the defendant from appropriating the valuable good will and trade of the plaintiff with the Pennsylvania Liquor Control Board, which it has developed since 1933.

The equities of the parties clearly appear when we consider that, although the defendant was the prior user of the trade-mark, it applied and registered the term only for a particular type of wine, and its use of the mark was prior to 1920, and was negligible and of little commercial value. The defendant, although intending to again use the name at some future time, refrained from objecting to the plaintiff's use even though it had knowledge of such use and of the fact that the plaintiff was acquiring and extending a large and valuable trade thereunder. It refrained also from offering in the first instance the brand which it claimed to the very customer with which the plaintiff built up its good will, and it declined at first to do business with that customer after offering other of its brands. Defendant apparently made no inquiry as to whether the plaintiff's product and its use of the name was in any way connected with those of Bisceglia Bros. with whom it had litigation in California, and from January, 1933, to January, 1937, permitted the uninterrupted use of the trade-mark by the plaintiff. Then, after the plaintiff had innocently created a valuable business in Pennsylvania, based upon the trade-mark, and independent of defendant's prior use or good will, it sought to destroy that business and appropriate the benefits to its own use by preventing the Liquor Control Board from purchasing the plaintiff's Greystone product.

On the other hand we find that the plaintiff and its predecessors appropriated the trade-mark immediately upon repeal without any knowledge of the prior use by the defendant, and without any grant or other permission of the producers in California which it knew operated cellars known as the Greystone Winery. Plaintiff introduced the brand to the Pennsylvania Liquor Control Board, expended large sums on its promotion, and succeeded in establishing a business of great volume with the very customer that the defendant had declined to do business

with, and in a territory where the defendant's product was not known by the trade-mark in question. Furthermore, the plaintiff used the mark upon a great variety of wines, so that it has become the distinguishing mark of the plaintiff's products rather than the designation of a single type.

Under these circumstances and the principles established, to permit Fruit Industries to claim the use of the trade-mark "Greystone" in Pennsylvania would take the trade and good will of the plaintiff, built up at much expense, and without notice of the defendant's rights, and confer it upon the defendant to the complete perversion of the law of trade-marks. The defendant's acquiescence and laches have in fact contributed to the creation of new and independent property rights in the plaintiff, and we consider its equitable rights are superior to those of the defendant.

Upon consideration of all of the evidence and the law, we believe the following findings and conclusions cover all of the controlling circumstances and the essential legal issues:

### Findings of Fact.

1. Defendant's assignor, California Wine Association, was engaged in wine production since 1895 and owned a plant known as the Greystone Winery. In the course of its business, it used the trade-mark "Greystone" and in 1911 registered the trade-mark in the Patent Office for a hock type wine.

2. The California Wine Association sought to promote the sale of domestic bottled wine, including Greystone, by means of a sales promotion campaign between 1911 and 1914 in Pennsylvania and elsewhere. Thereafter distribution of its bottled product was effected through its affiliated distributors.

3. Prior to 1920 about 95 per cent. of domestic wine was sold in bulk and distributed under the brand names of the individual purchasers, and the defendant's Greystone product did not enjoy any extensive sale or reputation.

4. In 1929 and during prohibition the California Wine Association, together with other firms, formed the Fruit Industries, Limited, and assigned all its assets, including the registered trade-mark "Greystone," which was renewed in 1931, and approximately 1,500 cases of Grey-

stone wine were marketed subsequent to 1933.

5. In 1925 the California Wine Association sold its Greystone Winery to Bisceglia Bros., a California partnership, not affiliated with the plaintiff herein, and thereafter the said partnership produced and sold wine under the trade-mark "Greystone," which it registered as "Greystone" in September, 1933.

6. Thereafter said registration was canceled at the instance of the defendant, and, as a result of other litigation, Bisceglia Bros. of California in October, 1936, abandoned all right to the trade-mark to the defendant, including their rights to the trade-mark "Greystone" as registered by the plaintiff herein in Pennsylvania on February 6, 1936.

7. Plaintiff and its predecessors purchased its wine from Bisceglia Bros. of California with knowledge that they operated the Greystone Winery but without any grant or other permission of the producers for the use of the name "Greystone."

8. Bisceglia Bros. of California made no protest of such use until May, 1936, and in July, 1936, they abandoned to the plaintiff all their rights to the use of the name in Pennsylvania.

9. Defendant, early in 1934, learned that Greystone, not its product, was being sold in Pennsylvania and that extensive sales thereof continued until the time of the defendant's protest to the Liquor Control Board on January 25, 1937. It made no inquiry to determine whether the product was that of Bisceglia Bros. of California, with whom it had litigation, although the name of the plaintiff distributor and its predecessors appeared on its labels and advertising matter.

10. Defendant offered its wines to the Pennsylvania Liquor Control Board at or about the time of repeal but did not offer its Greystone brand. It declined to sell to the board because of unacceptable credit terms. The plaintiff did offer and sell its Greystone brand to the board at or about the same time.

11. Plaintiff sold wine to the Liquor Control Board for a total of $1,345,707.61 in the three years ending December 31, 1936, and has expended $117,668.28 in advertising and promoting its brand. As a result, 90 per cent. of the plaintiff's busi-

ness is done with the board and about 30 per cent. of all wines sold in this state are the plaintiff's Greystone brand.

12. Upon receipt of notice from the defendant of the alleged infringement, the Liquor Control Board declined to purchase wine from the plaintiff between January 25 and March 5, 1937, when indemnity arrangements were effected, pending determination of the rights of the respective parties.

13. The use of the trade-mark by the plaintiff is not shown to have been fraudulent or with knowledge of the prior use or adoption by the defendant or by Bisceglia Bros. of California.

14. Defendant failed to notify the plaintiff of its claim to the trade-mark until November, 1936, and only made formal demand to cease its use on February 5, 1937.

Conclusions Of Law.

1. California Wine Association was the exclusive user of the trade-mark "Greystone" for its hock type wine prior to prohibition in 1920.

2. Nonuser of the trade-mark during the period of prohibition did not constitute an abandonment.

3. Plaintiff and its predecessors had no right to the use of the trade-mark prior to the advent of repeal.

4. Plaintiff and its predecessors did not acquire any rights in the trade-mark by assignment or otherwise from the defendant or the wine producers, Bisceglia Bros. of California.

5. Registration of the trade-mark is prima facie evidence of its adoption and ownership, and the burden of proving abandonment, laches, or acquiescence in the use by others is upon the plaintiff.

6. Plaintiff and its predecessors have acquired the right to the use of the trademark "Greystone" by the innocent adoption of the same and the extensive use thereof in this state to the point where such name is here indicative of the plaintiff's product.

7. Defendant has, by its conduct and its failure to project its business in this state, and having an equal opportunity, evidenced an intent to abandon, and is by its laches and acquiescence precluded from preventing the plaintiff from enjoying the benefits of its trade and good will in Pennsylvania which it has built up at great expense.

8. The acts of the defendant in seeking to restrain the plaintiff from exercising its rights in the trade-mark "Greystone" in Pennsylvania amount to unfair competition and, if permitted, would result in the transfer of the plaintiff's good will to the defendant, and would thereby accomplish a substantial inequity.

9. The plaintiff is entitled to injunctive relief, but, no damages being shown other than the costs incident to this litigation and the indemnity to the Liquor Control Board, no award of damages may be made.

10. The acts of both parties appear to have been done in good faith and under colorable title to the respective rights asserted, and we deem it proper that each party should bear its own costs.

11. A decree in accordance with the findings and conclusions herein may be submitted for entry as the order of this court.

The requests of the parties for findings of fact and conclusions of law, so far as they are consistent with the above, are affirmed, and, to the extent that they differ from the above findings and conclusions, they are denied.