## G. F. HEUBLEIN & BRO. v. BUSHMILL WINE & PRODUCTS CO. et al.

### Civil Action No. 595.

District Court, M. D. Pennsylvania.

June 29, 1944.

See also 2 F.R.D. 190.

Clarence P. Goldberg and Clarence G. Campbell, both of New York City, and O'Malley, Hill, Harris & Harris, of Scranton, for plaintiff.

Beekman Aitken, of New York City, and Thomas A. Donahoe, of Scranton, for defendants.

JOHNSON, District Judge.

This is a civil action wherein the plaintiff, G. F. Heublein and Brother, a Connecticut corporation, seeks to restrain the defendants in their use of a trade-mark and for which use plaintiff also demands damages. The defendants are incorporated in the State of Delaware, having their principal place of business at Scranton, Lackawanna County, within the Middle District of Pennsylvania, so that jurisdiction rests upon diversity of citizenship. The amount of damages claimed by plaintiff is in excess of three thousand ($3,000) dollars, exclusive of interest and costs. The defendants have filed a counterclaim requesting an injunction and damages.

The facts found from the pleadings, the voluminous testimony produced at trial of the issue without a jury, the many depositions and the large number of exhibits received in evidence are as follows:

The plaintiff, a Connecticut corporation, established in 1857, has been engaged since that date in the manufacture and sale of food products and alcoholic beverages. Among its products was a brand of blended whiskey sold under the trade-name of "Old . Raven". This product was sold throughout the United States until the passage of the 18th Amendment in 1919. During prohibition plaintiff confined its business to the manufacture and sale of food products. Immediately after repeal (Dec. 5, 1933), plaintiff resumed production and sale of alcoholic beverage products but did not resume production and sale of "Old Raven" whiskey.

On January 1, 1934, the Pennsylvania Liquor Control Board was established and became the sole channel through which distilled spirits could be marketed in Pennsylvania.

On January 3, 1934, the defendant corporation known as Bushmill Wine and Products Corporation, Inc., was organized under the laws of the State of Delaware. On June 20, 1939, the corporate title was changed to Brookside Distilling Products Corporation. On December 10, 1942, defendant changed its corporate title to Breck Distilled Products Corporation and then assigned both of the trade-marks, here in dispute, to a new Delaware corporation entitled Brookside Distilling Products Corporation. The good will of the previous corporation was also assigned to the last named corporation and on December 18, 1942, the certificates of registration granted by the Commonwealth of Pennsylvania, hereinafter referred to, were duly assigned to the new Brookside Distilling Products Corporation.

On February 8, 1934, the defendant, preparing to enter the market with a new product, ordered from the Gamse Lithographing Company a quantity of whiskey labels to be imprinted with the name "Raven Run". The testimony of the president of the defendant reveals that the name "Raven Run" was taken from a small town in Schuylkill County, Pennsylvania, named "Raven-run" near which his wife was born. Any knowledge of prior use of the name "Raven Run" was denied and remains uncontroverted.

During the month of October, 1935, after listing "Raven Run" whiskey with the Pennsylvania Liquor Control Board on special order, the defendant commenced to sell small quantities thereof within the Commonwealth and in August, 1936, secured a general listing of that product with the board. Thereafter defendant's "Raven Run" whiskey was stocked in all Pennsylvania State Stores and warehouses.

Although the plaintiff had secured a Federal Registration of the mark "Old Raven" in the latter part of 1939, it had made no sales thereof in Pennsylvania. In fact, the evidence shows that long prior to plaintiff's registration of "Old Raven" in the United States Patent Office the defendant had adopted that mark in Pennsylvania. Mr. Gentile, the president of the defendant, testified that the mark was adopted by the defendant in 1935. On December 17, 1936, in answer to an inquiry from defendant, Mida's Trade Mark and Patent Bureau, Incorporated, stated that a search had been made of the word "Raven" to determine if it had been registered. The search disclosed that the only similar marks registered on that date were "Red Raven" for wines and "Red Raven Splits", neither of which were registered by the plaintiff. An additional search was made on December 29, 1938, which disclosed registration of the marks "Ravenwood" and "Raven Valley" but no marks using the word "Raven" had been registered by the plaintiff.

From the date of the first sale of defendant's product until February 8, 1940, the sales made by defendant through State Stores in the Commonwealth were large and the record indicates a constant growth in volume of sales during that period.

On February 8, 1940, plaintiff learned from its patent attorneys that the defendant had applied for Federal registration of the trade-mark "Raven Run". On February 14, 1940, plaintiff sent a registered letter to defendant warning it that it was infringing upon a trade-mark owned by plaintiff. No reply was received by plaintiff and on September 26, 1941, a Federal Examiner of Interference sustained plaintiff's opposition proceedings and entered an order to the effect that defendant was not entitled to Federal registration of "Raven Run"; that it was confusingly similar to plaintiff's trade-mark "Old Raven", and that plaintiff had established prior use.

On August 20, 1940, plaintiff applied to the Pennsylvania Liquor Control Board for a special listing of "Old Raven" whiskey. The Board replied that the defendant had a listing under the same brand name and refused plaintiff's application. In this connection the testimony discloses that the defendant had applied to the Board for a listing of "Old Raven" as a blended rye whiskey on July 10, 1937.

It is thus established by the testimony that the defendant had listed a whiskey with the Pennsylvania Liquor Control Board under the mark "Raven Run" in October, 1935, and under the mark "Old Raven" on July 10, 1937, and that the dominating feature of these marks is the word "Raven".

It is further established by the testimony that the plaintiff, since repeal, had actively engaged in the marketing of many products. It had registered in the U. S. Patent Office the following marks on the dates shown: American Crest Whiskey, American Seal Whiskey and Forest Park Gin on August 27, 1935; Heublein Whiskey and an alcoholic cordial on September 24, 1935; Heublein P. F. D. on November 2, 1937. In Pennsylvania, through the Liquor Control Board it had sold various products as follows: Heublein's Martini Cocktails since February 13, 1934; Heublein's Manhattan Cocktails since April 2, 1934; The Club Cocktails, Heublein's Dry Martini Cocktails, Heublein's Old Fashioned Cocktails, and Heublein's Side Car Cocktails since September 15, 1935. The first entry of the plaintiff into the whiskey market in Pennsylvania was Heublein's Private Stock Rye Whiskey, listed on October 31, 1938. This was followed by a listing of Heublein's Forest Park Blend on October 16, 1939. As heretofore stated, the application of the plaintiff for a listing of Old Raven Whiskey on August 20, 1940, was refused because of the prior listing of the defendant two years and three months previously.

Knowledge of any prior use of the marks "Raven Run" and "Old Raven" was denied by the defendant and the evidence does not disclose that such prior use was, or should have been, known to its officers or employees. The plaintiff, however, since the first listing of its products in Pennsylvania, in January, 1934, has with regularity received every price list issued by the Liquor Control Board. There were 27 regular price lists issued and there were three supplemental price lists issued, all of which the plaintiff received. The Liquor Control Board also issued weekly statistical reports and a copy thereof was sent every week to the plaintiff. In all these price lists and statistical reports, admittedly received by the plaintiff, the products of the defendant appeared. The testimony discloses that the plaintiff, from March, 1936, to and including February, 1940, paid to the Board the sum of $2,396 for duplicate copies of the statistical reports, considering them of sufficient importance to have one copy sent to its principal office at Hartford, Connecticut, and the other copy sent to the office of its Pennsylvania manager at Philadelphia. In the reports of December 12, 1936, September 11, 1937, October 16, 1937, November 13, 1937, and December 31, 1937, the products of the plaintiff and the defendant are listed on the same page and in the reports of August 5, 12, 19, and 26, 1939, and September 9 and 23, 1939, the defendant's "Raven Run" is listed six lines above the plaintiff's "Heublein". In addition to the above other sources of information were open to the plaintiff. The defendant since January 4, 1937, continuously advertised "Raven Run" in "Tap and Tavern", the only liquor trade paper of state-wide circulation in Pennsylvania and of which, as an advertiser, the plaintiff received various copies. The defendant also advertised "Raven Run" in many newspapers of general circulation in Pennsylvania. The defendant also during November, 1936, and throughout the year of 1937, secured displays of its bottled merchandise and advertisements in the windows of approximately 550 of the Pennsylvania State Stores. During six of the weeks in which the defendant had such displays in the State Stores a product of the plaintiff known as "Milshire Gin" was displayed at the same time and in the same windows.

Much testimony was taken relating to the amounts of alcoholic beverages sold by both the parties to this action and the amount of money expended in advertising and promotion of their products which will not be repeated here as this Court is of the opinion that the right to use the mark here in dispute should not be governed by the quantities sold nor the cost of those sales. The small business is as much entitled to protection of its trade marks as the large business which can afford higher sales expenditures and more costly promotional enterprises.

The plaintiff contends: Firstly, that it is the prior adopter and user of the trade-mark "Old Raven"; secondly, that the defendant deliberately adopted "Raven Run" and then "Old Raven", intending thereby to secure the benefit of plaintiff's name and reputation; thirdly, that plaintiff did not abandon its mark "Old Raven" but resumed the use thereof as soon after Repeal as it could place on the market a product under that mark consistent with its policy and reputation for vending high quality products; fourthly, that the plaintiff had no knowledge of use by the defendant of the trade-mark "Old Raven" until February, 1940; fifthly, that the use by the defendant of the trade-mark "Raven Run", prior to February 8, 1940, was nominal compared to its later use and the defendant's use of the trade-mark "Old Raven" was at all times nominal prior to the commencement of this action; and sixthly, that the defendant should be enjoined from further use of either mark and should be assessed for the damages suffered by the plaintiff.

The defendant contends: Firstly, that it adopted the use of the word "Raven" as a mark for its products without the knowledge of any prior use thereof by the plaintiff; secondly, that the plaintiff has lost whatever rights it might have had to the mark in Pennsylvania by reason of non user and abandonment; thirdly, that the plaintiff is now barred from asserting any rights it might have had in the trade-marks in Pennsylvania because of laches and long acquiescence in the defendant's open, extensive and innocent use of those marks; and fourthly, that the plaintiff should be enjoined from use of the trade-marks "Old Raven" and "Raven Run" within the Commonwealth of Pennsylvania and should be held responsible for the damages it has caused the defendant.

The contentions of both parties will be discussed in the order in which they appear above.

■ The contention of the plaintiff that it was the prior adopter of the trade-mark "Old Raven" must be sustained. The defendant asserts that no documentary evidence was produced at trial to support that contention, but the evidence reveals that the plaintiff did produce "Old Raven" labels and record cards of purchase of those labels as well as record cards of customers who made purchases of "Old Raven" whiskey. Mr. Balgley, the president of plaintiff, and Mr. Lingo, now secretary and vice-president in charge of sales, testified to the extent of the sales of "Old Raven" whiskey by plaintiff up to the time of prohibition, and a former salesman, William T. Morrissey, testified to the same effect. Support of that contention was also given by the depositions of eleven liquor dealers, hotel wine stewards and barkeepers who were engaged in business in Pennsylvania during pre-prohibition days and who stated that they bought and sold the plaintiff's "Old Raven" whiskey until the prohibition amendment was passed.

■ The second contention of the plaintiff to the effect that the defendant deliberately adopted the trade-mark "Raven Run" and then "Old Raven", intending thereby to secure the benefit of plaintiff's name and reputation, is not sustained by the record. The president of the defendant, who selected the name "Raven Run", testified that the selection was innocently made without knowledge of any prior use and related that a small town named "Ravenrun", near which his wife was born, suggested the naming of the product. The name "Old Raven" was subsequently adopted, according to the testimony of the same witness, because that mark contained the word "Raven", at that time identified as a whiskey product of the defendant, in Pennsylvania, and yet served to distinguish a rye blend from a corn whiskey of the same producer. The testimony of this same witness that he had never heard of an "Old Raven" whiskey produced by the plaintiff is not only credible but is supported by other testimony. Many witnesses who testified in behalf of the defendant said that they had never heard of plaintiff's "Old Raven". Such witnesses included salesmen employed at State Liquor Stores who testified that they had never

been asked by any purchaser for plaintiff's brand of "Old Raven" whiskey and also included other witnesses who had been in the liquor business prior to Prohibition but who had never heard of plaintiff's brand of "Old Raven" whiskey. Moreover, the plaintiff's principal expert witness admitted that he had never heard of plaintiff's "Old Raven" before Repeal.

It is the third contention of the plaintiff that it did not abandon the mark "Old Raven" but resumed the use thereof as soon after Repeal as it could place upon the market a product under that mark consistent with its policy and reputation. In support of this contention the plaintiff introduced much testimony to the effect that it dealt only in high quality products and had established an enviable reputation in that respect; that its brand of whiskey known as "Old Raven" was a product of high quality prior to prohibition; that the plaintiff refused to reenter the market after Repeal with any product bearing its name until it was able to secure sufficient good whiskeys, both as to quality and continuity of supply, to assure the production of a quality whiskey; that plaintiff, at once after Repeal, began a search for such whiskeys but was unable to secure a supply of suitable quality for blending purposes in sufficient amounts to start production and of sufficient uniformity to sustain quality production. It is upon these reasons that plaintiff bases its assertion that it had no intention of abandoning its "Old Raven" but, on the contrary, was engaged, since Repeal, in a constant endeavor to recreate its old product. The difficulty with this contention of the plaintiff is that, in considering all the evidence adduced on this point, it is not credible, and it is sufficient to point out that many other producers of quality products were able to secure sufficient good whiskeys for blending purposes, both as to quality, sufficiency and continuity of supply, so as to place their products on the market soon after Repeal. In fact, the plaintiff itself produced other blended whiskeys while its alleged search for blending whiskeys was proceeding, and, moreover, placed on the market in Pennsylvania, in 1935 and 1939, two brands of blended whiskey known as Heublein's "Forest Park" and Heublein's "Private Stock", both of which were listed at a higher price than plaintiff's "Old Raven" sold in other localities.

The fourth contention of the plaintiff that it had no knowledge of the use by the defendant of the trade-mark "Old Raven" until February of 1940, is likewise not credible. The plaintiff had at its command and its disposal all necessary means of knowing of the use by the defendant of the marks "Raven Run" and "Old Raven". The plaintiff was selling several of its products in large quantities in Pennsylvania through the same medium of distribution as the defendant. The Liquor Control Board was the sole channel in existence in Pennsylvania for distribution and sale of liquor products. The price lists and statistical reports, heretofore mentioned, published by the Liquor Control Board, were considered of sufficient importance by the plaintiff for it to expend the sum of $2,396 for duplicate copies thereof to be sent to its Pennsylvania District Manager, and yet this Court is asked to believe that no one in the employ of plaintiff, either at the main office in Hartford or at the office of the district manager in Pennsylvania ever examined these publications with sufficient attention so as to learn what its competitors were doing with respect to prices, quantity of sales, quality of products and brand names in use. When this evidence is considered in connection with testimony which discloses that the defendant not only advertised its use of the word "Raven" in many newspapers of general circulation in Pennsylvania but also that, as related above, the product of defendant known as "Raven Run" was displayed widely in the windows of approximately 550 of the Pennsylvania State Stores during a part of 1936 and all of 1937, and further, that in several instances products of both plaintiff and defendant were displayed together at the same time, it is apparent that the testimony of the officers of the plaintiff to the effect that neither they nor the employees of the plaintiff knew of defendant's use of the trade-marks here in dispute is beyond belief.

As to the fifth contention of the plaintiff it is sufficient to state that the evidence shows that sales made by the defendant in Pennsylvania of its products, while small perhaps in relation to the sales of an older and a larger company, such as the plaintiff here, were surprisingly large when it is considered that the sales of the plaintiff were nationwide, exclusive of Pennsylvania, and that the sales of the defendant were confined to Pennsylvania. The defendant is entitled to protection of its trade marks and the extent of that protection is not governed by the amount of its sales.

The sixth contention of the plaintiff with respect to injunction and damages will be disposed of hereafter.

The first contention of the defendant, that it had innocently adopted the use of the word "Raven" as a mark for its products without knowledge of any prior use thereof by the plaintiff, has already been discussed and is sustained.

The second contention of the defendant that the plaintiff has lost whatever rights it might have had in Pennsylvania to the trade marks under discussion by reason of nonuser and abandonment is sustained. While there can be no abandonment imputed to the plaintiff during Prohibition, as it was prevented from sale of whiskey by circumstances beyond its control, Universal Candy Co. v. A. G. Morse Co., 54 App.D.C. 388, 298 F. 847, there nevertheless exists in this case, on the part of the plaintiff, all of the elements of nonuser and abandonment.

"On the law that trade-mark rights grow out of use, not mere adoption * * *" and on the principle recognized in law that there is no property in a trade-mark except as an incident to a business, we are inclined to the view that where, as here, one, owning a valid trade-mark and entitled to a given territory, fails by efforts which are reasonable in time and extent to project his business and the accompanying mark in that territory, he cannot by reason of the mere fact of ownership pre-empt that territory forever. We hold, on the facts, and on the law bearing on them, that trade-mark rights, like other rights that rest upon user, may be lost by abandonment, non-user, laches or acquiescence. Jacobs v. Iodent Chemical Co., 3 Cir., 41 F.2d 637, 640.

"The failure of a claimant during a long period to assert and enforce his rights and his essential disregard of the extensive use of the mark, while a large and valuable competitive business grew up about it, is proof of an intent to abandon." Bisceglia Bros. Corp. v. Fruit Industries, Ltd., D.C., 20 F.Supp. 564, 568, citing McKesson & Robbins, Inc., v. Charles H. Phillips Chemical Co., 2 Cir., 53 F.2d 342, and France Milling Co. v. Washburn-Crosby Co., 2 Cir., 7 F.2d 304.

The third contention of the defendant that the plaintiff is now barred from asserting any rights it might have had in the trade-marks in Pennsylvania, because of laches and long acquiescence in the defendant's open, extensive and innocent use of those marks is likewise sustained. The facts as found by this Court sitting as Judge and Jury preclude any other finding of law. This Court has found as a fact that the plaintiff must have known of the defendant's use of the trade-marks and also that the product sold under those marks in Pennsylvania has become identified solely with the name of the defendant. The delay on the part of the plaintiff in taking any action thereon until February of 1940 constitutes laches. Because the plaintiff must have known of the use by the defendant of these trade-marks it must now be held to have acquiesced in that use.

The apparent equities, determined by the facts and by the law as found by this trial court, demand that the defendant be protected in its established rights within the Commonwealth of Pennsylvania.

"There are cases where delay is excusable because it is necessary to obtain essential testimony or because a person unfamiliar with the subject-matter is ignorant of his rights, or where there is some situation that shows that a defendant should not be permitted to go on with his own wrongful conduct just because he has continued it for a long time.

"But it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished—especially in a case where the most that can be said is that the trade-mark infringement is a genuinely debatable question." Valvoline Oil Co. v. Havoline Oil Co., D.C., 211 F. 189, 195.

"For one to permit another to build up a reputation for one's goods under a trade-name for a long period of time, and then to assert an exclusive right to that name, and thereby acquire the benefit of the reputation and trade which the other has built up, when it lay in the power of the former at any time to have arrested the use of the trade-name by the latter, seems to me most inequitable, because, if the right had been asserted before the reputation was acquired, the infringer could have adopted another name and built his reputation on it. It would also tend to further deception upon the public, one of the results which injunctive relief in trade-mark cases seeks to prevent." Old Lexington Club Distillery Co. v. Kentucky Distilleries & Warehouse Co., D.C., 234 F. 464, 469.

"When delay in prosecuting a claim is so unusual as to carry with it the appearance of being unreasonable, as in this case, there devolves upon a plaintiff the burden of disclosing the impediments to an earlier action; of showing, if ignorant of his rights, how he had remained in ignorance so long; and of revealing how and when he first came to a knowledge of the matters on which he relies in his bill for relief. Badger v. Badger, 2 Wall. 87, 17 L.Ed. 836; Hardt v. Heidweyer, 152 U.S. 547, 14 S.Ct. 671, 38 L.Ed. 548. In other words, the plaintiffs in this case are bound to excuse the delay which they themselves disclose by their bill. Lane & Bodley Co. v. Locke, 150 U.S. 193, 14 S.Ct. 78, 37 L. Ed. 1049; McLaughlin v. [People's] Ry. Co., C. C., 21 F. 574." Window Glass Machine Co. v. Pittsburgh Plate Glass Co., 3 Cir., 284 F. 645, 650.

The defendant will be protected in its rights in and to the trade-marks in litigation within the geographical limits of the Commonwealth of Pennsylvania.

It therefore follows that the plaintiff, being denied injunctive relief for the reasons above set forth, is not entitled to damages. The defendant which is entitled to injunctive relief has not shown that it has sustained any damage beyond the costs in this action.

The requests of both parties for findings of fact and conclusions of law have been answered and filed with this opinion.

It is ordered and decreed that the plaintiff, G. F. Heublein, be, and it hereby is, perpetually enjoined from the use of the trade-marks "Raven Run" and "Old Raven" within the geographical limits of the Commonwealth of Pennsylvania, and it is further ordered that the costs of this action are to be assessed against the said plaintiff.