**LOUIS RICH, INC.**

v.

**HORACE W. LONGACRE, INC.**

Civ. A. No. 76–3211.

United States District Court,
E. D. Pennsylvania.

Dec. 17, 1976.

Robert C. Podwil, Philadelphia Pa., Joseph S. Littenberg, Westfield, N. J., for plaintiff.

Ronald E. Robinson, Lansdale, Pa., for defendant.

SUR PLEADINGS AND PROOF

LUONGO, District Judge.

"Gobble-gobble."

Those words identify the sound made by a male turkey. That fact and the desire of the contesting parties to profit from it furnish the stuff of this action for trademark infringement. Before me is plaintiff's motion pursuant to Fed.R.Civ.P. 65(a) seeking to enjoin defendant preliminarily from using the term "gobble-gobble" in its advertising of a processed turkey product. On the pleadings, and on the proof adduced at the hearing held on November 18, 1976, I make the following

## FINDINGS OF FACT

1. Plaintiff, Louis Rich, Inc., a corporation of the State of Iowa, manufactures and sells processed turkey meat products.

2. Defendant, Horace W. Longacre, Inc., a Pennsylvania corporation, competes with plaintiff in the manufacture and sale of processed turkey meat products.

3. Until 1976 plaintiff had limited its sales to the institutional market (hospitals, restaurants, and food service organizations). Late in 1974, in preparation for entry into the retail market, primarily supermarkets, plaintiff asked its advertising agency to develop a campaign designed to foster retail sales.

4. Plaintiff's advertising agency conceived a series of presentations for television, radio and newspapers featuring the use of the term "gobble-gobble" in a manner designed to create identification of that term with plaintiff's name and its various turkey meat products, including specifically, turkey frankfurters, turkey sausage and fresh turkey parts.

5. Plaintiff's advertising campaign began on January 28, 1976 with television and newspaper presentations in the Quad-Cities area of Davenport and Betancourt, Iowa, and Rock Island and Moline, Illinois. The television commercials featured, in the closings, a picture of the product with plaintiff's name superimposed on the screen immediately followed by the unexpected utterance of the term "gobble-gobble" by the on-camera actor. The closing, which is regarded as the most important part of a commercial, was designed and intended to enhance identification of the catchphrase "gobble-gobble" with plaintiff's name and products. The newspaper advertisements, and the later used radio commercials, all used the term "gobble-gobble" in a similar manner.

6. Commencing in January 1976, plaintiff furnished point-of-purchase display material to all of its brokers for distribution to meat merchandisers, meat buyers, and advertising managers for placement alongside plaintiff's processed turkey products in supermarkets and grocery stores. The display cards featured the name "Rich's," the type of product and "Gobble-Gobble." The term "gobble-gobble" did not appear on the packages themselves.

7. As part of its advertising campaign, plaintiff also used lapel buttons featuring "Gobble-Gobble" in large lettering and in smaller surrounding lettering, the words "Rich's" and "West Liberty, Ia." Over 20,000 of these buttons were produced and distributed to brokers supermarkets, and consumers.

8. On March 3, 1976, plaintiff applied for trademark registration for "Gobble-Gobble" based upon plaintiff's first intrastate use and its first use of the term in interstate commerce on January 22, 1976. The United States Patent Office issued Certificate of Registration No. 1,051,408 for "Gobble-Gobble" on its Principal Register for "Processed Turkey in the Shape of a Frankfurter" on October 26, 1976.

9. From January 28, 1976 through September 15, 1976, plaintiff conducted an extensive advertising campaign in the media, in the markets, at the times and at the costs set forth herein:

(a) Television advertisements:

| Date | Market | Cost |
|---|---|---|
| Jan. 28 - Feb. 13 | Quad-Cities | $ 5,410.00 |
| Mar. 24 - Apr. 11 | St. Louis | 13,935.00 |
| Apr. 12 - 17 | St. Louis | 3,100.00 |
| Apr. 28 - May 16 | St. Louis | 10,635.00 |
| May 20 -28 | Quad-Cities | 2,760.00 |
| May 20 - June 11 | Miami | 18,850.00 |
| July 28 - Aug. 15 | New York | 39,825.00 |
| Aug. 18 - Sept. 1 | San Francisco | 25,780.00 |
| Aug. 25 - Sept. 12 | New York | 45,550.00 (est.) |

(b) Radio advertisements:

| May 10 - 30 | St. Louis | 8,526.00 |
|---|---|---|
| May 10 - 30 | San Francisco | 14,091.00 |
| June 16 - July 3 | Miami | 7,794.00 |
| July 13 - 31 | San Francisco | 1,290.00 |
| July 28 - Aug. 11 | New York | 11,824.00 |
| Aug. 18 - Sept. 1 | San Francisco | 2,100.00 |

(c) Newspaper advertisements:

| Jan. 28 | Quad-Cities | 2,773.92 |
|---|---|---|
| Mar. 3 | Pittsburgh | 8,380.00 |
| Mar. 24 | St. Louis | 9,465.00 |
| Apr. 21, May 5 | St. Louis | 5,622.80 |
| May 5 | San Francisco | 11,259.76 |
| May 20 | Miami | 6,860.61 |
| June 16 | San Jose | 2,161.00 |
| June 16, 17 | Ft. Lauderdale | 1,276.50 |
| Sept. 15 | Seattle/Tacoma | 3,074.00 |

10. Up to the date of hearing (November 18, 1976) plaintiff spent a total of $494,-000 in 1976 on advertising using the term "gobble-gobble," as contrasted to a total expenditure of $35,000 for all advertising for the entire year 1975.

11. As set forth in No. 9 above, plaintiff advertised in the New York metropolitan area on television from July 28 to August 15, and from August 25 to September 12, 1976, and on radio from July 28 to August 11, 1976, at a total cost of approximately $95,000.

12. Among the products produced and marketed by defendant, Longacre, are frankfurters made out of chicken and ham made out of turkey.

13. To promote the sale of its products, defendant employed the advertising agency of Warren Pfaff, Inc. Pfaff produced, for defendant's chicken frankfurters, a commercial with a Bicentennial theme. It featured a little boy eating a frankfurter and speaking a catchphrase at the outset of the commercial, "What this country needs is a chicken in every frankfurter!" At the end of the commercial the little boy repeated the catchphrase. That commercial was aired from March or April to November 1976 at a total air time cost of approximately $375,000.

14. On July 7, 1976 representatives of defendant and Pfaff met to discuss a commercial to promote defendant's turkey ham product. Because of the success of the chicken frankfurter commercial, Pfaff decided to follow the same format. Between August 7 and 11 it developed a commercial which it presented to defendant for approval on August 11, and which it produced on film in Long Island City, New York, on August 25, 1976. The turkey ham commercial also featured a little boy who, at the outset of the commercial is asked, in the nature of a riddle, "What do you say to a ham that is made out of turkey?", to which he replies, hesitantly, "Gobble-gobble?" The boy is then shown eating the "ham" in a sandwich while an off-camera voice describes the product. There follows a picture of the package with the name "Longacre Family" and the product "Baked Tur-

key Ham" prominently displayed, as the off-camera voice announces defendant's name and product. The commercial closes with the little boy repeating the catch-phrase, "gobble-gobble," in a more positive manner.

A radio commercial using the same wording was also produced.

15. On Friday, August 27, 1976, one of the members of the Pfaff agency saw and heard in Pfaff's offices, on a television set which played constantly, but was viewed only intermittently, the end of plaintiff's turkey frankfurter commercial featuring the term "gobble-gobble." Recognizing a potential conflict with defendant's commercial, Pfaff's personnel made inquiry to ascertain the identity of the sponsor and the content of that commercial. On Monday, August 30, after notifying defendant that the problem existed, Pfaff obtained a kinescope copy of plaintiff's commercial from the American Broadcasting Company, on whose station it had been aired.

16. As of August 30, 1976 defendant had spent a total of approximately $23,000 in the preparation of commercials using the phrase "gobble-gobble." As of that date, defendant had not shown on any of the media, any advertisements using the term "gobble-gobble."

17. Representatives of defendant and Pfaff met on September 2, 1976, to discuss the problems created by the conflict in commercials. They played the kinescope copy of plaintiff's commercial. They considered the possibility of changing defendant's commercial, but rejected that course of action because:

(a) they concluded that no words could be substituted by "lip synchronization" for "gobble-gobble" in defendant's commercial and therefore changes would require re-filming of the portions of the commercial using that term;

(b) since the commercial had been shot on film (a more expensive process) rather than videotape, the cost to refilm the "gobble-gobble" portions would be approximately $15,000;

(c) it would take from two to five weeks to make the alterations and refilm the commercial, thereby making it impossible for defendant to meet its air time commitments for the commercial;

(d) they concluded that plaintiff and defendant had used the term "gobble-gobble" in different ways and that "gobble-gobble" was not the theme of plaintiff's commercial; and

(e) the conflict between the two commercials was not sufficiently great to warrant the cost of refilming defendant's commercial.

18. After it learned of plaintiff's commercial, defendant caused a search to be made to determine whether plaintiff had registered the mark "Gobble-Gobble" and learned that the application for registration of the mark was pending. It was then too late to file an objection to the mark, but defendant has since filed a petition for cancellation.

19. On September 1, 1976, plaintiff first became aware that a commercial using the term "gobble-gobble" in conjunction with turkey products was about to be aired in New York City. Plaintiff ordered an audit, as a result of which it learned the identity of the sponsor and the details of the commercial. Plaintiff communicated with defendant and made overtures to have defendant discontinue use of the term "gobble-gobble."

20. Notwithstanding plaintiff's request that it discontinue use of the term "gobble-gobble" in its commercial and notwithstanding notice from the National Broadcasting Company that plaintiff objected to the airing of defendant's commercial on the network's stations, defendant presented the commercial without changes on radio beginning September 13, 1976, and on television beginning September 15, 1976.

21. Defendant used its commercial with the term "gobble-gobble" extensively in the New York metropolitan area commencing on October 1, 1976, some two weeks after plaintiff's own advertising campaign of ap-

proximately seven weeks' duration in that area had ended.

22. Defendant's turkey ham commercial was presented on television and on radio on the following dates and in the following markets:

(a) Television advertisements:

| Date | Market |
|---|---|
| September 15-17, 22-24, 29-31 | Wilkes-Barre/Scranton |
| September 27 - October 29 | Minneapolis/St. Paul |
| September 27 - October 29 | Fort Wayne/Indianapolis |
| October 1, 20-22, 27-29 | New York |
| October 1, 20-22, 27-29 | Philadelphia |

(b) Radio advertisement:

| | |
|---|---|
| September 13 - October 1 | Harrisburg, Pa. |

---

23. From September 13 to the date of hearing, defendant had spent $125,000 to air the turkey ham commercial. It plans to continue to use that commercial for another six to eight months in those markets in which it has already advertised, and in new markets which it plans to add. Defendant expects to spend an additional $250,000 for air time for the commercial.

24. Following defendant's rejection of plaintiff's demand to discontinue use of the offending commercial, plaintiff instituted the instant suit on October 14, 1976. It filed an amended complaint on November 3, 1976, approximately one week after issuance of the trademark registration. Plaintiff filed this motion for preliminary injunction on November 4, 1976.

25. On September 29, 1976, Perdue, Inc. placed an advertisement in the New York Times promoting its "Oven Stuffer" roasting chickens, favorably comparing them with turkey. The advertisement concluded:

"You'll find a recipe right on the wing-tag that tells you how to cook it, stuff it and serve it. So you can just sit back and watch everybody gobble-gobble it up."

26. Webster's Third New International Dictionary of the English Language (Unabridged), at 972, contains two entries for the verb "gobble." One entry gives the following definition:

"[intransitive verb] 1: to make the natural guttural noise of a turkey cock . . 2: to make a sound resembling the gobble of a turkey . . . [transitive verb]: to utter or emit by or as if by gobbling. . . ."

The other entry reads:

"[transitive verb] 1: to eat greedily or swallow hastily and noisily in large mouthfuls: GULP . . . 2: to seize or capture greedily or hastily: take eagerly: GRAB—usu. used with *up* . . 3: to read rapidly or greedily . . . [intransitive verb]: to eat greedily and hastily." (Emphasis in original.)

As a noun, "gobble" is defined as "a noise made by or as if by gobbling."

27. "Gobble-gobble" is descriptive of the sound made by a turkey. It is suggestive of turkey, but it is not descriptive of turkey meat products.

28. Defendant's use of the term "gobble-gobble" in its turkey ham commercial is likely to cause confusion with plaintiff's turkey products.

29. Continued use by defendant of the term "gobble-gobble" will dilute, and may destroy, plaintiff's mark "Gobble-Gobble" as a means of identifying plaintiff as the source of turkey meat products.

30. If defendant is required to discontinue use of its turkey ham commercial, it will be subjected to additional costs to revise or reproduce the commercial. Such costs are capable of ascertainment and can be compensated by an award of money damages.

## DISCUSSION

█ Plaintiff seeks a preliminary injunction to prevent defendant from using the term "gobble-gobble" in conjunction with the advertising of defendant's turkey ham product. To prevail plaintiff must show that it will suffer immediate irreparable injury *pendente lite* and that it has a reasonable likelihood of success on the merits. *A. L. K. Corp. v. Columbia Pictures Industries, Inc.*, 440 F.2d 761, 763 (3d Cir. 1971). Equitable considerations are involved in the grant of this extraordinary relief:

> "[A]ward [of the injunction] is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction."

*Yakus v. United States*, 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944). Additional factors to be weighed in the balance include possible harm to other interested persons and the general public interest. *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 920 (3d Cir. 1974). I shall consider plaintiff's motion in light of each of these considerations.

### A. *Immediate irreparable harm.*

Plaintiff owns the registered trademark, "Gobble-Gobble," which it has utilized in radio, television, and newspaper advertisements in various markets throughout the country, including the New York metropolitan area. Defendant has been airing radio and television commercials which use the term "gobble-gobble" in a manner similar to the use of that term in plaintiff's advertisements. Defendant's commercials have also been aired in markets throughout the country, including the New York metropolitan area. Defendant intends to continue airing these commercials in these same markets and in others unless enjoined from doing so. It is readily apparent that, if defendant carries out its present intention, plaintiff's trademark will suffer. Plaintiff

has utilized the trademark "Gobble-Gobble" as a distinctive symbol which consumers would identify with its name and products. The value of the mark flows from its ability to identify, and it is this fact which underlies the law's protection of trademark rights. As Justice Frankfurter explained in *Mishawaka Rubber & Woolen Manufacturing Co. v. S. S. Kresge Co.*, 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942):

> "The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress."

The similarity between the use of the term "gobble-gobble" by plaintiff and defendant is likely to create confusion in consumers' minds, impairing the mark's function as a symbol of plaintiff's name and goods and thereby destroying the mark's value to plaintiff.

█ "The key aspect of this prerequisite is proof that the feared injury is irreparable; mere injury, even if serious or substantial is not sufficient." *United States v. Pennsylvania*, 533 F.2d 107, 110 (3d Cir. 1976). In a case of trademark infringement, irreparable injury may occur in a variety of ways. For example, a plaintiff may suffer irreparable damage to its goodwill if the infringement causes consumers

to misidentify the infringer's inferior goods as those of the plaintiff. *Villager, Inc. v. Dial Shoe Co.,* 256 F.Supp. 694, 698–99 (E.D. Pa.1966); *Chips 'N Twigs, Inc. v. Blue Jeans Corp.,* 146 F.Supp. 246, 248 (E.D.Pa. 1956). Although there is no evidence of product inferiority in this case, the fact that plaintiff has unwillingly had the symbol of its reputation placed in the infringer's hands is itself another example of irreparable injury, even though the infringer may be quite capable of producing a high-quality product. The injury is to plaintiff's interest in having exclusive control over the symbol of its own reputation. *Carling Brewing Co. v. Philip Morris, Inc.,* 277 F.Supp. 326, 335–36 (N.D.Ga.1967), *citing Yale Electric Corp. v. Robertson,* 26 F.2d 972, 974 (2d Cir. 1928) (L. Hand, J.). In this case, the irreparable harm is the damage which will be done to plaintiff's mark itself. As noted above, unless a preliminary injunction is granted, plaintiff will suffer a serious dilution of its trademark by the use of that mark in conjunction with a competitor's name and products, thereby losing the benefit of the mark's function as a distinctive identifier of plaintiff and its products. As a result, the value of the mark to plaintiff will be greatly impaired, and re-establishment of that value will be difficult, if not impossible. This in itself is a sufficient indication of irreparable harm to satisfy the requirement. *See Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.,* 428 F.2d 379, 381 (2d Cir. 1970).

■ Defendant argues that plaintiff's harm is not immediate. The evidence establishes that defendant is using and intends to continue using the commercials at issue. This use will extend to the New York metropolitan area, where defendant has already run its commercial and where plaintiff has already utilized its mark. So long as defendant runs its commercials, the harmful dilution persists and increases. Defendant argues that plaintiff's eight-

week delay[1] in seeking this injunction is proof that plaintiff is not suffering immediate harm. That argument is not at all convincing. During that eight-week period plaintiff made efforts to resolve amicably the dispute with defendant, insisting at all times, however, that defendant cease using its mark. Two months is not an inordinate amount of time to delay taking drastic legal action under such circumstances. *Cf. Le Cordon Bleu v. BPC Publishing Ltd.,* 327 F.Supp. 267, 270–71 (S.D.N.Y.1971). I am satisfied that the harm to plaintiff is immediate and that plaintiff has established this initial prerequisite to preliminary injunctive relief.

### B. *Likelihood of success on the merits.*

■ Plaintiff contends that it is entitled to protection from trademark infringement under both the Lanham Act, 15 U.S.C. § 1051 *et seq.,* and under common law. The Lanham Act, of course, has not supplanted common law trademark rights, which are based upon priority of adoption and use. The Act has merely provided additional protection if the common law rights have been perfected by federal registration of the mark. *See* 4 Callmann, *The Law of Unfair Competition, Trademarks and Monopolies,* 3d ed., § 97.1. The added protection afforded by registration includes, inter alia, constructive notice of the registrant's claim of ownership, 15 U.S.C. § 1072; statutory presumption in favor of the validity of the registrant's mark, *id.* §§ 1057(b), 1115; and federal statutory remedies for infringement of the mark, *id.* §§ 1114–18. 4 Callmann, *supra* § 97.3(d)(1). The common law rights are in no way dependent upon federal registration.

Defendant resists plaintiff's claim on two grounds: (1) that plaintiff does not have a trademark at all and, alternatively (2) if plaintiff does have a valid trademark, defendant has not infringed.

---

1. Approximately eight weeks elapsed from the time plaintiff first learned of defendant's commercial on September 1 until plaintiff filed its motion for preliminary injunction on October 4.

Only six weeks elapsed before plaintiff took legal action, however, since plaintiff instituted this action by filing a complaint on October 14.

*(1) Validity of plaintiff's trademark.*

*(a) Statutory presumptions.*

The initial issue to be resolved is the nature of plaintiff's trademark rights in "Gobble-Gobble." On October 26, 1976, that mark was registered to plaintiff by the Patent Office on its Principal Register. Plaintiff contends that by reason of that registration, it is entitled to the statutory presumption for all of its processed turkey products, including turkey parts, frankfurters and sausage.

The Lanham Act, 15 U.S.C. § 1057(b), provides that a certificate of registration serves as prima facie evidence of the validity of the registration, plaintiff's ownership of the mark, and plaintiff's "exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate." *See also id.* § 1115(a). Registration thus creates the presumption, inter alia, that the mark is valid, and that presumption dates back to the time plaintiff *applied* for its certificate of registration, March 3, 1976. *See Gillette Co. v. Kempel,* 254 F.2d 402, 45 C.C.P.A. 920 (1958). Plaintiff therefore is correct in asserting that defendant has the burden of proof in attacking the validity of the registered mark. The preliminary determination of validity has been entrusted to the Patent Office and a "strong presumption of validity" attaches to that determination. *See Aluminum Fabricating Co. v. Season-All Window Corp.,* 259 F.2d 314, 316–17 (2d Cir. 1958). The statutory presumption is limited, however, to "the goods or services specified in the certificate." Lanham Act, 15 U.S.C. §§ 1057(b), 1115(a); *see Borg-Warner Corp. v. York-Shipley, Inc.,* 293 F.2d 88, 91–94 (7th Cir.), *cert. denied,* 368 U.S. 939, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961); *Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co.,* 199 F.2d 407, 414 (8th Cir. 1952); *Avon Shoe Co. v. David Crystal, Inc.,* 171 F.Supp. 293, 298 (S.D.N.Y.1959), *aff'd,* 279 F.2d 607 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960). Since plaintiff's certificate of registration was limited to "Processed Turkey in the Shape of a Frankfurter," and since defend-

ant's alleged infringement is not with regard to that specific product, the statutory presumption is inapplicable in this case.

*(b) Trademark use.*

The question then becomes whether plaintiff has established trademark rights in Gobble-Gobble" as to processed turkey products in general notwithstanding lack of registration for that broad category of product.

It is a basic tenet of trademark law that trademark rights arise from first appropriation and use of a term. *See generally,* 3 R. Callmann, *supra,* § 76.1. I am satisfied from the evidence that plaintiff was the first user of the term "gobble-gobble." Defendant contends that plaintiff has not used the term *as a trademark.* The Lanham Act, 15 U.S.C. § 1127, provides that:

> "a mark shall be deemed to be used in commerce . . . on goods when it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto . . . ."

The evidence supports the conclusion that plaintiff used "Gobble-Gobble" on point-of-purchase display cards sent to all of its brokers for distribution and use in connection with the display and sale of its products throughout the country. Point-of-purchase display cards fit within the "displays associated therewith" language of § 1127. *Roux Laboratories, Inc. v. Clairol, Inc.,* 427 F.2d 823, 829–31 (Cust. & Pat.App.1970). I therefore conclude that plaintiff has used "Gobble-Gobble" as a trademark.

*(c) Descriptive vs. suggestive nature of the term.*

Defendant also contends that "gobble-gobble" is not a valid trademark in connection with turkey meat products because the term is *descriptive* of the products.

A term may not be accorded trademark status if it describes the marked goods or their ingredients, qualities, or characteristics. *Flexitized, Inc. v. National Flexitized Corp.,* 335 F.2d 774, 779–80 (2d

Cir. 1964), *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965) 3 Callmann, *supra*, § 69 *et seq.*[2] A distinction is drawn, however, between a description and a mere suggestion of the goods. For example in *Application of Colgate-Palmolive Co.*, 406 F.2d 1385 (Cust. & Pat.App.1969) the term "CHEW 'N CLEAN" was recognized as a valid trademark for dentifrice. The Court stated that, "Granted that CHEW 'N CLEAN might well, and doubtless does, suggest a possible manner and use of the dentifrice, it is not merely *descriptive* of the dentifrice *per se.*" *Id.* at 1386 (emphasis in original). Similarly, the slogan "WE PRINT–IT IN A MIN–IT" has been recognized as a valid mark for graphic reproduction services. *Application of Kopy Kat, Inc.*, 498 F.2d 1379 (Cust. & Pat.App.1974). As the Court explained—

> "The slogan is, obviously, highly suggestive of speed with respect to some kind of printing service, but one cannot tell what kind. It could be printing photographs, or printing with type, or making photostatic, xerographic, lithographic, photo offset, or other copies. . . .
>
> . . . We do not agree that the slogan identifies the services. We think it is clear from mere inspection why it does not . . . ."

*Id.* at 1380–81. Another example is *Application of Realistic Co.*, 440 F.2d 1393 (Cust. & Pat.App.1971), in which the term "CURV' " was recognized as having trademark status for permanent wave curling solutions on the ground that:

> "While it may be granted that CURV' does suggest a possible result of the intended use of the permanent wave curling solutions, it is not merely descriptive of the permanent wave curling solutions or the purpose for which such goods are to be used. . . . [T]he word 'curve' is as suggestive of almost any article of manufacture (i.e., anything having or

producing any type of curved shape) as it is of permanent wave curling solutions and their intended use. Indeed, the word 'curve' does not, in our opinion, in its primary significance indicate the purpose for which the permanent wave curling solutions are to be used."

*Id.* at 1394.

These cases indicate that the hallmark of a descriptive term is its specific identification of the marked goods. This explains why such terms as "Flora" or "Narcisse" (the French word for "narcissus") have been denied trademark status with regard to perfume. *See Caron Corp. v. Henri Muraour & Cie.*, 56 App.D.C. 347, 13 F.2d 318 , *cert. denied*, 273 U.S. 729, 47 S.Ct. 239, 71 L.Ed. 862 (1926). ("Narcisse"); *Florasynth Laboratories, Inc. v. Goldberg*, 86 F.Supp. 624 (N.D.Ill.1949) ("Flora"). In each case the term describes the fragrance of a perfume, and it is the fragrance by which a perfume is primarily identified.

The term "gobble-gobble" is *suggestive* of turkey. It describes the sound made by a turkey, but it does not describe turkey meat products. The term could suggest any of a variety of products having some connection with a turkey, for example, a turkey itself, or a stuffed or rubber toy in the shape of a turkey, or a device used to imitate the sound of a turkey, or some product made from turkey meat. The fact that a term describes the origin of a product does not make the term descriptive of the product itself. *San Francisco Ass'n for the Blind v. Industrial Aid for the Blind, Inc.*, 152 F.2d 532, 533–34 (8th Cir. 1946) (recognizing validity of trademark "BLINDCRAFT" for goods made by blind workers). Because "gobble-gobble" does not specifically identify the goods here at issue, or some ingredient, quality, or characteristic of them, the term is not so descriptive as to be not entitled to trade-

---

**2.** *See also* Lanham Act, 15 U.S.C. § 1052, which provides that

> "No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration

on the principal register on account of its nature unless it—
(e) Consists of a mark which, (1) when applied to the goods of the applicant is merely descriptive or deceptively misdescriptive of them . . . ."

mark status.[3] Plaintiff does have a valid trademark in "Gobble-Gobble."

## 2. Infringement.

A further question is whether plaintiff has established the likelihood that it will ultimately be able to prove infringement of its mark by defendant.

 In addition to the protection afforded by the common law, plaintiff's mark is protected by § 1114(1) of the Lanham Act[4] even though the alleged infringement was not as to the goods specified in plaintiff's certificate of registration. As explained in *Pure Foods, Inc. v. Minute Maid Corp.*, 214 F.2d 792 (5th Cir.), *cert. denied*, 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697 (1954), which involved infringement by a frozen meat seller of a mark used for frozen juice concentrates—

"[I]t is true that an applicant registers a trade-mark in connection with particular goods specified in the certificate of registration, 15 U.S.C.A. §§ 1051, 1057. Plaintiff's registered trade-mark is limited to frozen juice concentrates. The remedies of an owner of a registered trade-mark, however, are not limited to the goods specified in the certificate but extend to any goods on which the use of an infringing mark 'is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods'. 15 U.S.

C.A. § 1114(1). The Lanham Act thus adopts the principle stated in A.L.I. Restatement of the Law of Torts, Vol. III, § 730, .pp. 597, 598, § 731.

'One's interest in a trade-mark or trade name came to be protected against simulation, * * * not only on competing goods, but on goods so related in the market to those on which the trade-mark or trade name is used that the good or ill repute of the one type of goods is likely to be visited upon the other. Thus one's interest in a trade-mark or trade name is protected against being subjected to the hazards of another's business.' "

*Id.* at 796–97. *Accord, American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 623–24 (5th Cir. 1963) (infringement by a seller of dinner rolls of a mark registered for potato chips and horseradish and also used for such items as peanuts, popcorn, peanut butter, and cheese cracker sandwiches).

 To prevail either under the Act or at common law, plaintiff need only prove that defendant's use of the term "gobble-gobble" in its commercial is *likely* to cause confusion with plaintiff's products; it is not necessary to show actual confusion. *American Foods, supra* at 624; *Thomson-Porcelite Co. v. Harad*, 366 Pa. 121, 125–26, 51 A.2d 605 (1947). The Third Circuit has intimated

---

**3.** In its proposed findings of fact and conclusions of law and in an accompanying memorandum, defendant has sought to call the court's attention to a series of Patent Office documents which, it contends, support the view that "gobble-gobble" is a descriptive term. These documents were not introduced as evidence at the hearing, and I therefore, may not properly consider them. Defendant's reference to 15 U.S.C. § 1057(e), which provides that copies of Patent Office records and registrations "shall be evidence in all cases wherein the originals would be evidence," is misplaced. The statute does no more than to create an exception to the "best evidence" rule. *See* Fed.R.Ev. 1002; *cf.* Fed.R.Ev. 1005. Notwithstanding that the documents are not properly a part of the record, I have nevertheless examined them and conclude that they would not change the result in any event.

**4.** Section 1114(1) provides:

"Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

shall be liable in a civil action by the registrant for the remedies hereinafter provided."

that use of an identical mark upon identical services in the same marketplace during competition for the same customers would establish a likelihood of confusion entitling a claimant to injunctive relief. *Holiday Inns of America, Inc. v. B&B Corp.*, 409 F.2d 614, 617 (3d Cir. 1969). I see no basis for distinguishing between goods and services, accordingly the Third Circuit's statement in the *Holiday Inns* case appears to be applicable to these facts. The parties in this case have used an identical term ("gobble-gobble") in an identical manner (as a distinctive catchphrase at the closing of their commercials) to promote the sale of the same type of goods (processed turkey meat products). The parties' commercials have been directed to retail consumers in the same market, the New York metropolitan area. As a result, confusion as to the source of the products is very likely.

Defendant seeks to raise a defense to the infringement claim under § 1115(b) which provides:

"If the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 subject to any conditions or limitations stated therein except when one of the following defenses or defects is established:

\* \* \* \* \* \*

(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to registration of the mark under this chapter . . . *Provided, however,* That this defense or defect shall apply only for the area in which such continuous prior use is proved . . . ."

■ It is defendant's contention that, since it had no actual knowledge of plaintiff's trademark at the time it conceived and produced its turkey ham "gobble-gobble" commercial, defendant is free to continue to use it, at least in the New York market, because it had started to use the commercial prior to October 26, 1976, the date when plaintiff's mark was registered.

I think that the effect of § 1115(b) is simply to remove the statutorily created "conclusive evidence" feature of the registration of an incontestable mark, relegating the owner of the mark to the normal burden of proving the validity of its mark and its right to the exclusive use of it. *See* and compare *Avon Shoe Co. v. David Crystal, Inc.*, 279 F.2d 607, 614 (2d Cir.), *cert. denied*, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960), in which the Court articulated, but did not decide, the question whether § 1115(b)(5) establishes a defense to an incontestable mark or "merely allows an innocent junior user, whose use antedated the first user's registration, to avoid the conclusive effect of an otherwise incontestable registration, thus leaving the first user to his remedy under § 1114(1), subject to proving the validity of his mark."

In the instant case, plaintiff does not, indeed could not, claim that its mark is incontestable, since it has not been in continuous use for the required five years. We are, therefore, not concerned with whether, or with what type of evidence, a defense might be raised to an *incontestable* mark. Defendant's proferred interpretation, unsupported by citation of authority, runs counter to the design of the statute to protect the prior user of a mark. While defendant's conception and production of the offending commercial may have been innocent, its use of the commercial commencing weeks after it had learned of plaintiff's mark, was decidedly not.

Defendant also contends that the term "gobble-gobble" in its commercial was a "fair use" since it was not used in a trademark sense.

■ It is not a trademark infringement to use words in their ordinary, rather than in their special trademark, meaning. *Gracious Lady Service, Inc. v. Welcome Wagon International Inc.*, 295 F.Supp. 1373

**1340**

(E.D.Pa.1969); *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861, 865 (S.D.N.Y. 1962), aff'd, 312 F.2d 125 (2d Cir. 1963). In my view defendant's use of "gobble-gobble" in its commercial was not in any sense ordinary. "Gobble-gobble" was uttered twice in the commercial, the second time in a manner strikingly similar to the use in plaintiff's commercials. The name of the product was spoken while a picture of the product was shown; then the principal actor in the commercial declared, "gobble-gobble," fostering an identification of that word with the name of the manufacturer and its product. This was not a use of the term in its ordinary meaning.[5]

I conclude that plaintiff has established the likelihood that it will succeed on the merits of this trademark infringement case. The second element necessary for a preliminary injunction therefore has been satisfied.

### C. *Balancing of the equities.*

■■■ The third element to be considered in the issuance of a preliminary injunction is whether greater harm would result from the withholding of preliminary injunctive relief than would be caused by the granting of it.

Applying that test to this case, if defendant is not enjoined from further using its commercial, the value of the trademark "Gobble-Gobble" to plaintiff will surely be diluted, and possibly destroyed. Such harm to goodwill has been held to be irreparable. *See Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.*, 428 F.2d 379 (2d Cir. 1970); *LeFebure Corp. v. Lefebure, Inc.*, 284 F.Supp. 617, 625 (E.D.La.1968); *Manpower, Inc. v. Womenpower, Inc.*, 288 F.Supp. 132 (D.P.R.1968). *See also P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.*, 462 F.2d 134 (2d Cir. 1972); *Estee Lauder, Inc. v.*

*Watsky*, 323 F.Supp. 1064, 1067–68 (S.D.N.Y.1970). On the other hand, if the preliminary injunction does issue and if the defendant is prevented from further using its commercial, it will simply be put to the cost of either revising the present one or producing an entirely new one. Whichever course defendant chooses to follow, the harm to it can adequately be compensated by an award of money damages. The evidence disclosed that defendant had expended a total of approximately $23,000 in the production of the offending commercial before it learned of plaintiff's use. There was some evidence that defendant's commercial could be revised at a fairly modest cost, in the area of $1,500, with some question, however, as to whether the end product would be "professional." The highest estimate to do a totally "professional" job did not exceed $15,000. If a new commercial were produced, presumably the cost would not exceed $23,000 at the outer limits. Adequate provision to protect defendant against such losses can be made by requiring the posting of a bond as a condition to the issuance of a preliminary injunction.

Balancing the equities leads me to conclude that far greater harm would be caused to plaintiff by the withholding of preliminary injunctive relief than would be caused to defendant by the grant of such relief. These are the only considerations involved in this case since there has been no showing of potential harm to others or to the general public interest.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter.

2. Plaintiff, Louis Rich, Inc., is the registrant in United States Trademark Registration No. 1,051,408 on the Principal Regis-

---

**5.** An example of a "fair use" of the term "gobble-gobble" can be found in Perdue's September 29, 1976 advertisement in the New York Times. The advertisement closed by stating, ". . . you can just sit back and watch everybody gobble-gobble it up." The advertisement had favorably compared Perdue's roasting chickens with turkey, and therefore in context, the phrase suggested a reference to, and a comparison with, turkey. The primary

use of the words "gobble-gobble," however, was in accordance with a dictionary meaning of the term—to eat something greedily or hastily. The term was not used in a trademark sense, although one might well suspect that Perdue intended, at the same time, to profit from the play on words so soon after the extensive running of plaintiff's advertisements featuring the term "gobble-gobble."

ter of the United States Patent Office, and as such is the owner of the mark "Gobble-Gobble."

3. Plaintiff has the exclusive right to use the mark "Gobble-Gobble" in commerce in connection with processed turkey in the shape of a frankfurter.

4. Plaintiff is entitled to protection against the use of its mark without its permission by others in the advertising of goods which is likely to cause confusion.

5. Plaintiff and defendant, Horace W. Longacre, Inc., are both in the business of selling processed turkey products.

6. Plaintiff has used and continues to use its mark "Gobble-Gobble" in the advertising of its processed turkey products. Defendant's use of the term "gobble-gobble" in the advertising of its turkey ham product creates a likelihood of confusion to consumers of processed turkey products and infringes plaintiff's rights in the mark "Gobble-Gobble."

7. Defendant's advertising of its turkey ham product using the term "gobble-gobble" began after defendant had actual knowledge of plaintiff's prior use of the mark "Gobble-Gobble" for processed turkey products.

8. If defendant is permitted to continue its advertising, plaintiff will suffer immediate irreparable harm in that the value of the mark "Gobble-Gobble" as a means of identifying plaintiff as the source of processed turkey products will be substantially diluted or destroyed. Damage to the intangible element of goodwill is difficult, if not impossible, to ascertain, and warrants preliminary injunctive relief.

9. Damage to defendant from the grant of preliminary injunctive relief will be capable of ascertainment and can be adequately compensated by the award of money damages.

10. Plaintiff has demonstrated the likelihood that it will prevail at final hearing and that it will be able to establish:

(a) that the mark "Gobble-Gobble" is suggestive of turkey, but is not so descriptive

of turkey products as to be incapable of trademark significance;

(b) that defendant's use of the term "gobble-gobble" in its turkey ham commercial was not a fair use of the term; and

(c) that defendant's use of the term "gobble-gobble" after knowledge of plaintiff's prior use of the mark was not in good faith.

11. A preliminary injunction should be granted conditioned upon the filing of a bond in an amount sufficient to compensate defendant for damages in the event that it be ultimately determined that the preliminary injunctive relief had been improvidently granted.