**HQ NETWORK SYSTEMS, Plaintiff,**

v.

**EXECUTIVE HEADQUARTERS and David Keating, Defendants.**

**Civ. A. No. 90–10988–Y.**

United States District Court, D. Massachusetts.

Jan. 15, 1991.

James E. Cockfield, Lahive & Cockfield, Boston, Mass., Jeffrey Allen, John J. Tracy, Law Offices of Jeffrey Allen, Wellesley, Mass., Thomas V. Smurzynski, Lahive & Cockfield, Boston, Mass., David C. Powell, HQ Network Systems, Inc., San Francisco, Cal., for plaintiff.

Edward T. Robinson, Gaston and Snow, Boston, Mass., for Executive Headquarters.

## MEMORANDUM OF DECISION

YOUNG, District Judge.

By agreement of the parties, this case was tried on the affidavits and documents submitted in support of and opposition to a motion for preliminary injunction which, by order of the Court, was consolidated with trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). The parties stipulated that, if called to testify, the affiants would testify in accordance with their affidavits. On September 14, 1990, the Court delivered its opinion in this action from the bench, reserving the right to expand on and detail the legal reasons applied to the facts found. This is that decision.

The plaintiff, HQ Network Systems, Incorporated ("Network"), brings this action against Executive Headquarters, Incorporated ("Executive") and David Keating ("Keating") for service mark infringement and false designation of origin pursuant to the trademark laws of the United States and for service mark and trade name infringement, unfair competition, and dilution arising under the laws of the Commonwealth of Massachusetts and the common law. The Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1338(a), (b) and 15 U.S.C. Section 1121 and pendent jurisdiction over the unfair competition, statutory service mark, and trade name infringement, dilution, and common law claims. Venue is proper in this district

because the defendants are residents hereof and because certain of the claims arose in this district.

Network is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at 120 Montgomery Street, Suite 1040, San Francisco, California. Executive is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at 303 Congress Street, Suite 600, Boston, Massachusetts.

Network is engaged in the provision of executive office centers and ancillary support services and supplies through various licensees throughout the United States and western Europe. There are approximately 3,000 competing executive suite operations of a similar nature in the United States alone.

The executive suite industry—that is, the renting of executive office space with ancillary services—is close to a 1.2 billion dollar a year industry. Since 1987 it has experienced a 35 percent growth rate. The average executive suite center in the United States grosses revenue estimated at $400,-000 per annum. The executive suite industry grows at a rate of 200 national and international locations per year. Network is today one of the world's largest executive suite firms.

Network manages over 90 executive suites throughout the United States. These suites are owned and operated by independent companies which have a franchise relationship with Network.

In 1978, three partners formed the corporation that has today evolved into Network. This corporation was the successor in interest to a company whose partners had operated under the name Executive Assistance since 1967 in downtown San Francisco. In order to fill vacant office space, Executive Assistance began providing executive services, office supplies, word processing, and other support services along with the office space subleased to tenants.

The executive suite concept became popular very quickly, and Executive Assistance began franchising in September, 1978,

under the trade name and service mark Headquarters Companies. Franchisees paid a royalty based on their gross profits to Executive Assistance in exchange for the right to use the Headquarters Companies service marks and expertise.

In May, 1983, the successor corporation to Executive Assistance was bought out by UTC, a conglomerate with revenues of approximately 18 billion dollars. On July 1, 1985, UTC indirectly sold the service marks back to the original 21 franchisees existing in 1983. The original franchisees who had purchased the service marks from UTC formed an entity called HQ Licensees Council and HQ Network Systems, Incorporated, the plaintiff in the present litigation, to coordinate the franchisees' efforts in service mark protection, standards, marketing, sales, and purchasing. In late 1986, the responsibilities previously assigned to the HQ Licensees Council were transferred to Network, and that corporation has been responsible for all aspects of the operation since then.

In 1985 Network had 31 locations in the United States. As of March, 1990, it had over 90 locations in the United States and one center each in England and Belgium. Each Network location is known by its clients as a "business center" or as an "executive center." An average executive center consists of 54 offices, and the Network as a whole has a total of 5,106 offices which are leased by over 5,000 different clients. Network's gross sales for the year 1989 were $63,483,170 and projected revenues for the year 1990 are expected to be in the neighborhood of $75,000,000.

In January, 1990, Entrepreneur Magazine named Network the number one franchisor in the executive suite industry, based on a survey of over a thousand United States and Canadian franchisors. The largest competitors are Omni Executive Suites, with approximately 15 centers; Pedus Executive Suites, with 15 to 20 centers; and Executive Business Centers, with approximately 20 centers.

In addition, many independent executive suites belong to a trade association known

as Executive Suite Network, but this entity does not market executive suites under any service mark or trade name; it merely provides a forum for shared expertise among business people in the executive suite industry and produces a directory of member executive suites which appear under their individual names.

Network targets small to medium-sized businesses as clients for its executive centers. Frequently large companies will use Network to establish branch offices in new locations in which they intend to test the market or maintain a small office. Approximately 300 of Network's clients have locations in more than one executive center.

Network's executive suites provide complete business support for corporations and individuals, which support includes, but is not limited to, provision of office space and facilities, secretarial services, telephone answering services, sales, lease and supply of furniture, equipment, office supplies and printing materials, direct mail services, word processing facilities, and document distributions.

Network's services and those of its licensees are identified by and rendered under the service marks "HQ" and "Headquarters Companies." Network advertises in many different media nationwide. As used in its marketing, Network emphasizes a logo of the letters HQ in capital block letters enclosed between an upper and a lower line. It's a distinctive logo, featured prominently in their advertising.

Network has expended substantial sums of money in advertising under its HQ and Headquarters Companies marks, seeking to gain goodwill from that advertising. At all material times Network has been possessed of a federally registered trademark, 1,513,-850, issued on January 12, 1988, for the term "Headquarters Companies" and federally registered trademark 1,322,487, issued February 26, 1985, for the HQ design just described. The goods and services to be covered by these marks are office support services and rental of executive office space.

The bulk of Network's national advertising is placed in the Wall Street Journal. Network has expended the following sums on national advertising for the years 1983 through 1989, inclusive:

| | | |
|---|---|---|
| marketing expense for advertising | — | $2,589,375.07 |
| national media | — | $2,188,513.19 |
| total | — | $4,877,888.26 |

Network's licensees also advertise on local and regional bases. The aggregate of this licensee advertising for the year 1989 was $2,922,439.31.

Network distributes a newsletter entitled "HQ Today" to its clients in order to maintain Network's reputation as being sensitive to clients' needs and to induce the clients to lease additional offices in other executive centers. It sends approximately 5,000 of these newsletters to its clients every three months.

Network also distributes a broker hot sheet, which is a direct mailing sent to approximately 1,600 real estate brokers every 60 days. Network also sends a direct mailing to decision-makers at large corporations which may be looking for branch offices. Approximately 1,000 of these mailings are sent every 60 days.

Network throughout its history has hired various public relations firms, and since June, 1990, has been using Dudell Associates ("Dudell") as its public relations firm. Dudell sends press releases to various publications in order to persuade them to write articles or provide other publicity for Network.[1]

Network also maintains a trade booth for use at trade shows. The trade booth is used approximately six times per year on average.

All of these efforts have resulted in Network enjoying a reputation that it is a reputable, properly managed executive suite business. Network enforces its standards on its licensees throughout the nation.

---

1. Network's operation has been frequently the subject of favorable newspaper and magazine articles. Exhibits B–1 through B–28 to the declaration of Thomas J. Tison are accurate examples of such articles.

In Boston a company called Van Loan, Incorporated ("Van Loan") is a licensee and, under the rules of organization of Network, is also a shareholder of that company. Van Loan operates two executive office centers in Boston, and one each in Framingham, Cambridge, and Providence, Rhode Island. Each of these centers uses the HQ and Headquarters Companies service marks. The first such office opened in November, 1980, at 945 Concord Street in Framingham. Offices of Van Loan as licensee of Network have since opened at 50 Milk Street in Boston in July, 1981, at 124 Mount Auburn Street in Cambridge in August, 1984, at the World Trade Center in Boston in February, 1989, and in Providence, Rhode Island, in March, 1990. All of these executive office centers are now operating and have been continuously operating from the date they first opened. These centers provide office space and business support services to the public.

Each Network center offers between 50 and 60 offices for businesspeople to occupy. The office space is available on a part-time, full-time, or hourly basis. Van Loan provides business support services to the tenants on its premises as well as to the public at large, including but not limited to secretarial, word processing, facsimile, photocopying, office supplies, telex, telephone answering, and office and equipment furniture leasing.

Each such office has approximately 12 employees including a general manager, a sales manager, and an operations supervisor. Network prides itself on its reputation as a first-class operation, its convenient downtown and financial district locations throughout the nation,[2] and its ability to attract clients through extensive local and national advertising.

In Network executive office centers the receptionist does not answer the phone for outside calls. These are handled instead in an inside phone room. In this way, visitors will not hear a receptionist pick up the phone several times and respond with the name of different businesses each time.

Network has advertised in the Boston area since 1980, in the Boston Globe, numerous regional business magazines, and radio and television advertisements.

Van Loan, the Network licensee in the Boston area, is also the beneficiary of the national advertisements placed by Network, including for several years an advertisement every two weeks, and recently, weekly, in the Wall Street Journal. As a result of this advertising and as a result of providing reputable services, Network has a significant valuable reputation in the Boston area which is symbolized by its marks "HQ" and, to a lesser extent, by the phrase "Headquarters Companies."

In addition, Van Loan has, for the last several years, signed an annual contract with the Boston Globe under which Van Loan pays for 10,000 lines of classified advertising in the real estate section of the paper. This generally translates into ads appearing in almost every Tuesday and Sunday edition of the paper.

Van Loan has also advertised in magazines with a business orientation in the Boston area. Such magazines include the Boston Business Journal, New Hampshire Business Review, New England Business, and the New England Real Estate Journal.

Since 1980, Van Loan has been listed and has had display advertisements in the Nynex Yellow Pages for the Boston–Cambridge, Framingham, and Natick directories.

Van Loan has frequently advertised on the radio in the Boston area over the past several years and continues to do so. Radio commercials of 10 seconds or 60 seconds duration advertising HQ and Headquarters Companies have appeared on the air over various Boston radio stations, such as WBOS, WEEI, WHDH, and WSSH literally thousands of times. Since November, 1988, the service marks HQ and Headquarters Companies have been used in ad-

---

**2.** Network's executive office centers are located only in those buildings considered to be "Class A" by the real estate community. The record is not clear what is meant by the descriptive term "Class A." The Court infers that the reference means that Network locates its executive suites in what it believes are the best areas for financial and business dealings.

vertising in conjunction with the New England Weather Bureau on various radio stations in the Boston area.

Van Loan has also advertised on television in the Boston area using the service marks HQ and Headquarters Companies in the aural portion of the advertisements to identify itself. Such an advertising campaign was run from March through June, 1989, on the following cable television channels: ESPN, CNN, Lifetime, Celtics Sports Channel, and Red Sox–NESN.[3] This advertising campaign featured a sixty-second commercial filmed at Van Loan's World Trade Center location in Boston. Van Loan also advertised on Channel 27, WHLL, from August, 1989, through February, 1990.

All this advertising costs Van Loan approximately $15,000 per month.

Van Loan prepares and distributes a quarterly newsletter called "HQ News" concerning Network's operations generally and its locations and personnel in the Boston area particularly. The newsletter is distributed to personnel and clients of Network's centers in the Boston area and reminds them of the facilities and services available as well as giving them general news.[4]

Network's Boston executive centers now have excess capacity. In 1990–91, competition in the executive suite industry can be expected to be aggressive because the recent downturn in the Boston economy will cause local businesses to look to executive suites as a means of saving on expenses. The entry of new competitors alongside Network, in this time when many local firms are obliged to consider relocation or office reorganization, increases possibilities for conflict and customer misunderstanding.

In this light, consider a brief telephone call received by the sales manager of Network's Boston licensee, Patricia A. Whelchel. The caller, Whelchel reported, want-

ed to know how much Network charged for the executive office suites, but made no other inquiries and was very rude. Ms. Whelchel assumed the caller had been frustrated in seeking information, and she asked the caller how familiar he was with the executive suite concept. He said that he had visited Network's office on Congress Street but did not indicate how he came to believe that Network had an office on Congress Street. Ms. Whelchel told him that Network had no offices on Congress Street. At this, the caller became very sarcastic, saying "How long have you been with the company? You *do* have offices on Congress Street." He then hung up without thanking her.

The defendant David Keating is a real estate developer, active primarily in Eastern Massachusetts. He has been president of Wharf Development in Boston for the past ten years. About seven or eight years ago he planned and built an office building known as 303 Congress Street, located in South Boston just across the Fort Point Channel from the Federal Reserve Bank.

This building has been owned continuously by a limited partnership, Channel Associates. It was the first new building introduced in the warehouse district in 50 years. On September 7, 1986, Notter, Finegold & Alexander, Incorporated, architects of the building, won an award for the outstanding design of the building from the New England Regional Council, a component of the American Institute of Architects.

Mr. Keating's responsibilities include leasing of the office space at 303 Congress Street. Until February, 1990, his sixth floor tenant was Executive Offices, Incorporated, which was in the business of renting furnished office suites with associated office services. After Executive Offices announced its plans to leave 303 Congress Street, a number of Executive Offices' tenants asked Mr. Keating if they could stay. He decided to undertake the business of Executive Offices, utilizing the sixth floor

---

**3.** That is, the telecast of the Red Sox baseball games by the New England Sports Network.

**4.** The Court credits each of the exhibits attached to the Van Loan, Bronte, and Marstall declara-

tions as true and accurate examples of what they purport to represent. Further reference will be made to them as necessary.

in the same fashion, and formed a new corporation called Executive Headquarters, Incorporated. He chose this name after consultation with counsel. At the time Mr. Keating chose the name Executive Headquarters he was aware that Network was doing business in Boston in an identical line of work under the name and style Headquarters Companies.

Mr. Keating is responsible for the advertising for Executive. Since March, 1990 he has placed about ten ads in the Boston Globe. He plans over the next few months to place in the Boston Globe approximately two to four times a month, advertising similar in size and content to the ads he has already been running. On those occasions where Executive's services have been advertised in the Boston Globe, such advertisements appear on the same page as advertisements for Network's executive suites. In addition to the Boston Globe, Executive has advertised once in the New England Real Estate Journal.

Mr. Keating plans to focus Executive's advertising in the future in the Boston Globe and the Nynex Yellow Pages. Executive has never advertised on radio or television, and has no plans to do so.

Executive began operation approximately March 1, 1990.[5] At 303 Congress Street, Executive has a total of 41 rentable offices of which 23 are presently filled. Of these offices, 18 are filled with people who were occupants under the initial management of Executive Offices. Of the new occupants that have come in since Executive started operations, most came as a result of word-of-mouth referrals. Executive has no plans to expand the number of offices it has available at 303 Congress Street and no present plans to start operations at any other site.

Executive employed Lorri A. Krupwich as its manager in January, 1990. She had earlier worked for Executive Office Centers. The occupants of offices at Executive include recruiters, sales businesses, a person who works for a foundation, a stu-

dent loan office, and a Ramada Inn regional office. About half of the occupants of these offices operate their own businesses from a single location at 303 Congress Street. Half are employees of businesses located elsewhere.

Originally Executive printed 75 promotional and informational packages. Approximately 40 of these have been distributed and about 35 remain. Inquires about Executive's services are referred to Ms. Krupwich, and she receives about three to four calls per week about space and about one walk-in. Prospective customers, as described by Ms. Krupwich, generally appear to be experienced businesspersons and careful shoppers for space. They often visit and tour the offices a number of times before commencing serious negotiations, frequently questioning her extensively about details of Executive's operation and the details of its charges. Prospects on occasion mention that they have visited other locations they are considering. Ms. Krupwich answers questions, takes inquirers on a tour of the premises, and shows them the offices Executive has available. Ms. Krupwich explains the services that are provided and Executive's charges. The basic charge for space ranges from $750 to $1,350 per month.

Prospects sometimes have the standard licensing agreement of Executive reviewed by counsel, and not infrequently specific terms have to be renegotiated. On average it takes several months from the time a prospect first contacts Ms. Krupwich until the prospect moves in.

One of the occupants of Executive's office suites is Birch Tree Financial Services, Incorporated, a stock brokerage company. This specific office is managed by one James Phillips, one of the most knowledgeable investment brokers concerning cable TV investment in New England. Though this 303 Congress Street office of Birch Tree is a branch office, Mr. Phillips considers it to be his headquarters. He considered his decision as to location to be a

---

**5.** As was the case with Network's submissions, the attachments to Executive's various declarations and affidavits are all accepted by the Court as true and correct exemplars of what they purport to show.

serious one with major long-term significance for his business. His choice to locate at Executive, which he made in July, 1990, occurred after long and detailed examination of its location and five other location options. His investigation was done by mail, by phone, and by site visits, including interviews with existing tenants at 303 Congress Street and three of the other locations he was considering. He considered the Network location at the World Trade Center. He first came to Executive as a result of the manager at another location having made reference to Executive. He chose Executive because he considered the physical premises and special atmosphere best suited for his activity because the existing tenants complimented Executive on its management, the terms were favorable, and he liked the location and view.

Executive has a receptionist but, unlike Network's standard operations, this receptionist answers telephone calls on behalf of the various businesses located in that executive center. The receptionist's desk is staffed approximately four hours a day, whereas in Network's operation it's staffed for the entire business day.

■ The central issue in this case is whether there is a likelihood of confusion between Network's use of its registered mark Headquarters Companies and Executive's use of the term Executive Headquarters. This is the key element in any infringement action. *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 28 (1st Cir.1989); *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983); *Purolator, Incorporated v. E.F.R.A. Distributors, Incorporated*, 687 F.2d 554, 559 (1st Cir.1982). *Pump, Inc. v. Collins Mgmnt., Inc.*, 746 F.Supp. 1159, 1165 (D.Mass.1990); *R.J. Toomey Co. v. Toomey*, 683 F.Supp. 873, 875–76 (D.Mass.1988). It is a factual

issue, *Forum Corporation of North America v. Forum, Limited*, 903 F.2d 434, 438 (7th Cir.1990).

■ In assessing the likelihood of confusion, this Court looks to the following standard factors: One, the similarity of the marks; two, the similarity of the goods or services; three, the relationship between the parties' channels of trade; four, the relationship between the parties' advertisements; five, the classes of prospective purchasers; six, the evidence of actual confusion; seven, the defendants' intent in adopting the mark; and eight, the strength of the mark. *Pignons S.A. de Mecanique v. Polaroid Corporation*, 657 F.2d 482, 487 (1st Cir.1981). No one factor is determinative but each must be considered. *Pignons* at 486–87. The Court proceeds to consider the several factors.

■ First, the similarity of the marks: The marks in question are Headquarters Companies and Executive Headquarters. The protection to be given to the phrase Headquarters Companies ought not be diluted by the fact that Network displays its logo HQ most prominently in its advertising in the Boston area.[6] Nevertheless, the Court must consider the similarity of the marks in light of what actually occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods or services. *Alpha Industries, Incorporated v. Alpha Steel Tube and Shapes, Incorporated*, 616 F.2d 440, 444 (9th Cir.1980).

■ In the phrase Headquarters Companies the key word—"headquarters"—is used as an adjective. It describes the type of company that is involved. In Executive Headquarters, however, the word "headquarters" is used as a noun, and the word "executive" is merely a descriptive adjec-

---

**6.** The Court notes that various of the affiants have declared that Network licensees are encouraged to prominently display the phrase Headquarters Companies. The Court rejects this testimony because, in light of the advertising examples presented, the primary logo here in Boston is HQ with two lines, one above and

one below. There is in Boston no doubt that the phrase Headquarters Companies is used, but in the Boston area, at least, the service mark HQ with the two lines is what's most prominently used, and the mark Headquarters Companies, while deserving of protection, is used to a lesser extent with lesser prominence.

tive.[7] While the word "headquarters" appears in both names, the total number of syllables is different as in the phonetic emphasis in pronouncing the name. Compare the discussion in *Calamari Fisheries, Incorporated v. The Village Catch, Incorporated,* 698 F.Supp. 994, 1009–10 (D.Mass. 1988) where Judge Woodlock, adopting the careful findings of Magistrate Saris[8] evaluates the similarities between "Beer Nuts" and "Brew Nuts," *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 926 (10th Cir.1986), between "Honey Baked Ham" and "Honey Sweet Ham," *Schmitt v. Honeysweet Hams, Inc.,* 656 F.Supp. 92, 96 (N.D.Ga.1986), and ultimately between The Daily Catch and The Village Catch. No such similarity is present here beyond the use of the same word, "headquarters," in both titles. The grammar as well as the phonetic and semantic similarities are less compelling in this case than those in which legal similarity was held to obtain.

Moreover, in considering the circumstances surrounding the actual purchase of these goods, *see Alpha Industries, supra,* it is notable that the two companies' advertisements in the Boston Globe frequently overlap such that the advertisements of the two companies are virtually or, on occasion, literally side by side. Thus, a prospective purchaser would reasonably understand that there are two separate and competing companies, and this manner of presentation counts against a finding of similarity of the marks.

As to the second point, the similarity of the goods or services: The Court finds that the goods and services being offered by the two companies are identical in all material respects. To the extent that they differ, Network provides superior arrangements, with more services, higher internal standards, but higher costs to clients. The goods and services sought to be offered, however, are in all respects identical. The Court has little doubt that Executive would offer services identical to Network had it the same available capital.

The third and fourth factors are the relationship between the parties' channels of trade and the relationship between the parties' advertising. Here the relationship is entirely congruent, though Executive's advertising is far more limited than that of Network. While the extensive advertising of Network garners for it a much broader goodwill and a much greater acceptance in the marketplace than the advertising of Executive, they both use the Boston Globe, and they use it in a similar fashion. Indeed, because Network advertises so frequently, the advertisements of Executive are frequently side by side with those of Network.

Moreover, the class of prospective purchasers appears to be identical. The universe of prospects for Executive are likewise people who are within the market that Network is trying to reach. It may be that Network is trying to reach a broader market, a more upscale market; but on this record there are no legally material differences in their targeted markets.

Network's prices are higher than those of Executive and Network has a number of business centers in a variety of locations. It has a center, for instance, on Milk Street in the very heart of the Boston financial district; it also has a center at the World Trade Center, a desirable location for various international commercial activities in and about the Port of Boston. Network thus seeks to serve a broad array of small and medium-sized businesses as well as major corporations.

Of course, Executive would like to serve the entire market but, since it only has one location and more limited resources, it cannot and, therefore, does not. In sum, Network and Executive are attempting to serve the same market.

Under *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201, 1206–07 (1st Cir.1983), this Court takes into account the nature of the

---

**7.** The Court finds that in advertising this type of business suite the word "executive" is used frequently, is not distinctive, and is a word descriptive of the services offered.

**8.** Now Justice Saris of the Massachusetts Superior Court.

people purchasing or buying these services. The market here is not comprised of people buying hairspray. The people who buy business center services are relatively sophisticated; that is, they know that they are entering into a lease of real property, a transaction which in Massachusetts is bounded by the most careful statutes, with a complicated recordation process and, indeed, a specialized court of national reputation—the Massachusetts Land Court—devoted precisely to real property issues.

Thus the prospective and actual purchasers of the services of both Network and Executive are at least relatively sophisticated businesspeople—individual entrepreneurs or employees of larger entities who, either on their own behalf or because it is required of them as business managers, are most concerned about the bottom line as well as all the other prudent business judgments which one would be expected to make in leasing property and services. This is therefore not a case involving the spending of discretionary income on the primary basis of slick brochures and fancy advertising. Here the prospective buyer appears to investigate the value of the services to be rendered.

As to the sixth point, actual confusion: It's clear that Network need not show actual confusion in order to prevail on its claim of service mark infringement. Mere likelihood of confusion is enough. Actual confusion, however, is highly persuasive of the point. *McDonald's Corporation v. McBagel's Incorporated,* 649 F.Supp. 1268, 1277 (S.D.N.Y.1986); *Calamari Fisheries, supra* at 1011. Here, the so-called evidence of actual confusion is too vague and evanescent to form a credible basis for the conclusion that when this rude man spoke to Ms. Whelchel there was actual confusion between Executive's services and that of Network's. That one instance is not, in this Court's judgment, persuasive evidence of actual confusion.

[6] As to the seventh point, the defendants' intent in adopting the mark: Here Mr. Keating was aware of Headquarters Companies, i.e., Network operating through its licensee as Headquarters Companies in Boston. He knew the line of work they were in, and he knew that Executive, or whatever he was going to call it, was going to get into precisely that line of work. On the other hand, the word "headquarters" and the phrase "headquarters company," as will be discussed below, are descriptive terms both in their military sense and in their commercial or business sense. If these were arbitrary terms, whimsical terms, this Court would have little hesitancy on this record in concluding that Mr. Keating adopted the title Executive Headquarters to copy Headquarters Companies. On this record, however, the proof is far less persuasive. Since the level of sophistication of potential lessees of executive suite services is quite high, no presumption of bad faith on Keating's part arises. *See Astra,* 718 F.2d at 1203, 1208. Compare *R.J. Toomey Co.,* 683 F.Supp. at 877–78. Here, Network must carry the burden of proof on this point by a fair preponderance of the evidence. Whether it has done so turns, in significant measure, on the strength of Network's mark. Therefore, the Court will return to this point after analyzing the strength of the "Headquarters Companies" mark.

The strength of the mark: Marks, the Court learns in this case through the able arguments of counsel and from its own research, can be classified into four general categories which range from generic—as to which there is no protection, to arbitrary—as to which there is protection even absent evidence of secondary meaning. Trademark protection grows as one ascends along the range from generic to descriptive to suggestive to arbitrary.[9] Here are examples of each of these four categories:

9. Distinctiveness is commonly analyzed in terms of a spectrum reflecting degrees of inherent distinctiveness. The traditional categories are generic designations, which cannot be distinctive ...; descriptive designations, which are not distinctive absent proof of sec-

ondary meaning ...; and suggestive, arbitrary, and fanciful designations, which are considered inherently distinctive.... The spectrum is delineated in, *e.g., Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786

a. A generic mark is one such as "Office Space," which simply states what is offered.[10]

b. A descriptive mark is a mark such as "General Motors," at least in its formative years, as the mark describes the operations of a motor car company. In *Railroad Salvage of Connecticut, Inc. v. Railroad Salvage, Inc.*, 561 F Supp. 1014, 1020 (D.R.I. 1983), Judge Selya explained that "vision center" was a mark descriptive of a place where one purchases eyeglasses, and in the *Calamari* case Magistrate Saris recommended, and Judge Woodlock held, that the phrase "The Daily Catch" was a mark descriptive of a seafood restaurant. *Calamari, supra* at 1013.[11]

c. Suggestive marks are marks such as Roach Motel, *American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 106 (2d Cir.1978), and Tide, *Procter & Gamble Co. v. Audiger, Inc.*, 135 U.S.P.Q. 490 (Tm.Tr.App.Bd.1962).[12]

---

(5th Cir.1983); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976). Restatement 3d, *Unfair Competition* § 13 Comment b (Tentative Draft No. 2, March 23, 1990) Reporter's Note at 48 ("Unfair Competition").

10. A generic designation is a term that denominates a general type or class of goods, service, or business. 'Camera' is a generic designation for a type of goods, 'computer programming' for a type of service, and 'bank' for a type of business. A term that denominates a subcategory of a more general class, such as 'light' used with beer or 'diet' with cola, is also generic. As in the case of descriptive designations, abbreviations or misspellings recognized as shorthand or corrupted forms of generic words generally retain the character of the original term, and words in foreign languages are characterized according to their English translations.... Generic designations are not subject to appropriation as trademarks at common law and are ineligible for registration under state and federal trademark statutes.
*Unfair Competition*, § 15, Comment a.

11. Determinations of descriptiveness must be made with reference to the specific goods, services, or business with which the designation is used. The term TRIM may be descriptive when used in connection with hedge clippers, clothing, or hair styling services but arbitrary when used as a trademark for toothpaste, cement, or brokerage services. Thus CAR–FRESHNER is descriptive of an auto deodorizer, VISION CENTER of an optical clinic, RICH 'N CHIPS of chocolate chip cookies, and HOMEMAKERS of housekeeping services. Slogans adopted by sellers to identify their goods and services frequently describe the products to which they relate. The phrase EXTRA STRENGTH PAIN RELIEVER used in connection with the marketing of an analgesic, for example, is descriptive and unprotectable as a trademark absent proof of secondary meaning.
*Unfair Competition*, § 14, Comment a.
The examples of descriptive designations appearing in the Comment are taken from *W.E. Bassett Co. v. Revlon, Inc.*, 354 F.2d 868 (2d Cir.1966) (TRIM on manicuring implements); *Car Freshner Corp. v. Auto Aid Manufacturing Corp.*, 461 F.Supp. 1055 (N.D.N.Y. 1978) (CAR–FRESHNER); *Vision Center v. Opticks, Inc.*, 596 F.2d 111 (5th Cir.1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980) (VISION CENTER); *In re Keebler Co.*, 479 F.2d 1405 (C.C.P.A.1973) (RICH 'N CHIPS); *Homemakers Home and Health Care Services, Inc. v. Chicago Home for the Friendless*, 484 F.2d 625 (7th Cir.1973) (HOMEMAKERS).
Slogans found to be descriptive and thus unprotectable absent proof of secondary meaning include, *e.g., Norm Thompson Outfitters, Inc. v. General Motors Corp.*, 448 F.2d 1293 (9th Cir.1971) (ESCAPE FROM THE ORDINARY for clothing held descriptive and lacking secondary meaning); *Roux Laboratories, Inc. v. Clairol Inc.*, 427 F.2d 823 (C.C.P.A. 1970) (HAIR COLOR SO NATURAL ONLY HER HAIRDRESSER KNOWS FOR SURE descriptive of hair coloring but secondary meaning established). The example in the Comment is taken from *Bristol–Myers Co. v. Approved Pharmaceutical Corp.*, 149 U.S.P.Q. 896 (N.Y.Sup.Ct.1966) (EXTRA STRENGTH PAIN RELIEVER found to have acquired secondary meaning).
*Unfair Competition*, § 14, Comment a., Reporter's Note at 72.

12. I have to say personally that Roach Motel seems rather descriptive to me, and a quite neat description at that, but Tide is suggestive of things of the sea only. It requires an inferential leap to associate the term with a detergent used in water.
Examples of suggestive marks include, *e.g., Hindu Incense v. Meadows*, 692 F.2d 1048 (6th Cir.1982) (GENIE on incense); ... *Norwich Pharmacal Co. v. Chas. Pfizer & Co.*, 165 U.S. P.Q. 644 (Tm.Tr.App.Bd.1970) (UNBURN on sunburn remedy).
*Unfair Competition*, § 13, Comment b, Reporter's Note at 49.
... COPPERTONE is merely suggestive of a tanning lotion, CYCLONE of wire fence, WRANGLER of jeans, and GOBBLE GOBBLE of turkey meat. Such suggestive terms are considered inherently distinctive.
*Unfair Competition*, § 14, Comment b.

d. Counsel provides Rolls Royce as an example of an arbitrary mark and I accept it as such.[13]

Where does the word "headquarters" and the phrase "headquarters companies" fall along this range? To satisfactorily address the matter, it is necessary briefly to limn the history of the word and phrase.

The initial use of the term "headquarters" was military. The most ancient example given of the term "headquarters" in the Oxford Unabridged Dictionary is found in Clarendon, *History of the Rebellion*, describing the entourage of King Charles I at the Battle of Edgehill in 1647 during the English Civil War. There the term meant the residence, permanent or temporary, of the commander-in-chief of an army. *7 Oxford Unabridged Dictionary*, 49–50 (1989). Over time the word "headquarters" has come to apply to military operations much smaller than those of a field army, and in that parlance it denotes the place whence a commander's orders are issued.

As such, the word "headquarters" has a long and very familiar military derivation. A very few examples will suffice to make the point: Crauford's *History of the Light Division* (1891) makes reference to "Wellington and the whole of his headquarters" moving during the Peninsula War in 1812.[14] Lee's famous General Order Number Nine surrendering the Army of Northern Virginia is captioned "Headquarters, Army of Northern Virginia, April 10, 1865." C. Dowdey & L Manarin ed., *The Wartime Papers of R.E. Lee*, 934 (1982). Indeed, there's the famous story of General John Pope who took command of the Department of Virginia and captioned his first orders as emanating from his "Headquarters in the Saddle." Pope was, of course, defeated by Lee at Second Manassas, and it was remarked that "Pope's headquarters were where his hindquarters ought to have been." This is part of our literature and our history.[15] By that time, as noted above, the term "headquarters" referred to much smaller entities than field armies. Regiments had headquarters, and the orders of these smaller military organizations were so captioned, *see e.g.* T. Higginson, *Army Life in a Black Regiment*, 277 (1962), where the orders of the commander as issued through the adjutant are captioned "Headquarters 33d United States Colored Troops, late 1st South Carolina Volunteers."

---

The COPPERTONE example is taken from *Douglas Laboratories Corp. v. Copper Tan, Inc.*, 210 F.2d 453 (2d Cir.), *cert. denied*, 347 U.S. 968, 74 S.Ct. 779, 98 L.Ed. 1109 (1954); CYCLONE is taken from *Hancock v. American Steel & Wire Co. of New Jersey*, 203 F.2d 737 (C.C.P.A.1953); WRANGLER is taken from *Blue Bell, Inc. v. Ruesman*, 335 F.Supp. 236 (N.D.Ga.1971); GOBBLE–GOBBLE is taken from *Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F.Supp. 1327 (E.D.Pa.1976). *Unfair Competition*, § 14, Comment b, Reporter's Note at 79.

**13.** Examples of arbitrary marks include, *e.g., Stork Restaurant, Inc. v. Sahati*, 166 F.2d 348 (9th Cir.1948) (THE STORK CLUB for a night club); *WGBH Educational Foundation Inc. v. Penthouse International Ltd.*, 453 F.Supp. 1347 (S.D.N.Y.1978), *aff'd*, 598 F.2d 610 (2d Cir. 1979) (NOVA for a television science program); *Borden, Inc. v. Topps Chewing Gum, Inc.*, 173 U.S.P.Q. 447 (Tm.Tr.App.Bd.1972) (ICE CREAM for chewing gum).

Examples of fanciful marks include, *e.g., Polaroid Corp. v. Polaraid, Inc.*, 319 F.2d 830 (7th Cir.1963) (POLAROID 'is a coined or invented word'); *Kotabs, Inc. v. Kotex Co.*, 50 F.2d 810 (3d Cir.), *cert. denied*, 284 U.S. 665, 52 S.Ct. 41, 76 L.Ed. 563 (1931) (KOTEX 'is a coined word, arbitrary in the extreme'); *Clorox Chemical Co. v. Chlorit Mfg. Corp.*, 25 F.Supp. 702 (E.D.N.Y.1938) (CLOROX 'is a fanciful word, arbitrarily selected'). *Unfair Competition*, § 13, Comment c, Reporter's Note at 49.

**14.** While Crauford brought out his *History of the Light Division* in 1891, emphasizing the accomplishments of his illustrious forebearer as its commander, it is clear that Wellington himself was signing dispatches at his "Headquarters at Lavos" in 1808. W. Napier, *Peninsular War* (1853) Appendix no. 1, 758. For a novelist's less flattering account of the savagery with which General Crauford suppressed insurrection in Ireland, *see* T. Flanagan, *The Year of the French* (1979), and for a second novelist's description of his death in 1812 at the siege of Ciudad Rodrigo, *see* B. Cornwell, *Sharpe's Company* 47–48 (1982).

**15.** While the story is well known to Civil War buffs, its widespread currency among Americans in general may be demonstrated by noting that Shelby Foote recounted it most recently on the Public Broadcasting Service TV series "The Civil War," September 24, 1990.

It doesn't appear, though, that the term "headquarters company" had yet come into use. A quick sampling of the regimental rosters published in 1868 by the Adjutant General of the Commonwealth of Massachusetts entitled *Record of the Massachusetts Volunteers* reveals that none of the various regiments checked—the 6th Regiment Massachusetts Volunteer Militia, the 12th Massachusetts Infantry, the 20th Massachusetts Volunteer Infantry, the 28th Massachusetts Infantry, and the 54th Massachusetts Volunteer Infantry—had a headquarters company.[16] Nor, indeed, did the British Army. *See generally* B. Farwell, *Mr. Kipling's Army*, 32–48 (1981).

The term was certainly in use by World War I, however. In that war, units as small as a regiment had a headquarters company, *see* Field Service Regulations, United States Army, 1914, as reprinted in *Complete U.S. Infantry Guide* (1917) 1644, 1677–1979,[17] and today every battalion has one. G. Gurney, *A Pictorial History of the United States Army* (1966) 192–94. Militarily, the "headquarters company" is the administrative unit furnishing the necessary specialist personnel for a headquarters. Webster's New International Unabridged Dictionary (1950).

The history of the term "headquarters" in civilian life is not nearly as old but, again, reference to the Oxford Unabridged Dictionary demonstrates that as early as 1780 in A. Young, *A Tour in Ireland,* reference is made to a Dobbin's Inn in Ballyporeen as being the "headquarters" of a tour. In this usage a headquarters is a chief or central place of residence, meeting, or business, a center of operations. The term has been used thereafter in precisely this sense.

This review of the historical antecedents leads the Court to conclude initially that the term "headquarters companies" is nothing more than descriptive, and thus a weak mark. It's a play on words with respect to the military usage of the administrative unit that supports a headquarters. It's a rather neat play on those words, because in the civil corporate context this is precisely the service Headquarters Companies provides.

Yet further analysis is required. Upon reflection the Court concludes that the service mark "Headquarters Companies" is not merely descriptive. First, the term here under scrutiny is "Headquarters Companies," not headquarters company. As the reference is to a series, the phrase is thus used in a different sense than it is used militarily. There is no such entity as headquarters companies; there is no military organization where a group of headquarters companies get together. So in that sense it's not simply descriptive.

16. These regiments were sampled due to the variety of their organizational backgrounds. The Sixth was a fine pre-war militia organization which fought its way through Baltimore to rescue Washington at the beginning of the Civil War. 1 *Massachusetts Soldiers Sailors, and Marines in the Civil War* 371 (1931) ("Mass. Soldiers"). *See* J. Jakes, *The Titans* 253–68 (1976). The Twelfth was a kid glove Beacon Hill Regiment recruited by Daniel Webster's son. It brought the song "John Brown's Body" to the war and fought in the wheatfield at Antietam, losing over a third of its number in twenty minutes but capturing the flag of Hood's 1st Texas Infantry. II *Mass. Soldiers, supra* at 1. B. Catton, *Mr. Lincoln's Army* 39–40 (1951). Mr. Justice Holmes went to war as a First Lieutenant in Company A, 20th Massachusetts, one of the two "Harvard" regiments—the other was the 2nd Massachusetts Volunteers—so named for the number of Harvard students and graduates in their ranks. Wounded three times, Holmes finished the war a brevet Colonel. II *Mass. Soldiers, supra* at 499. *See generally* D.

Wilson, "A regiment's glory—and gore," The Boston Globe, p. A31 (Nov. 25, 1990). The Twenty-eighth was an Irish regiment, part of Meagher's Irish Brigade. It was decimated on the slopes of Marye's Heights beyond Fredericksburg where it carried a large green silk flag emblazoned with a gold harp to within yards of Longstreet's line. The painting "Clear the Way" by D. Troiani depicts this moment. It is reproduced as the frontispiece to the February, 1988 issue of Military History. The Fifty-fourth, one of the first and among the most famous of America's black regiments, fought at Battery Wagner and is remembered most recently in the movie "Glory" (1989). *See* B. Catton, *Never Call Retreat* 220–21 (1965). *See generally* W. Young, *"Amy Warwick* Encounters the *Quaker City:* The District of Massachusetts and the President's War Powers," 74 Mass. Law Rev. 221 (1989).

17. A regiment of cavalry had a headquarters troop and a regiment of artillery a headquarters detachment.

■ Second, the Court gives proper credit to the extensive advertising made by Network to garner goodwill for its service marks "HQ" and "Headquarters Companies." This advertising is extensive and pervasive. This case is evidence of Network's willingness to defend its marks promptly and properly. In the business of executive suite rentals, "Headquarters Companies" has garnered a secondary meaning. The Court, therefore, finds that the mark "Headquarters Companies" is on the cusp between being descriptive and being suggestive. It is, if you will, a suggestive mark with descriptive elements. It is, therefore, a somewhat stronger mark than a merely descriptive mark.

■ While the Court takes all these findings together to make the ultimate finding, a brief recap is in order:

The dissimilarity of the marks cuts in favor of Executive. These marks are not sufficiently similar, standing alone, in the manner in which they are used in the marketplace and the manner by which one comes to use the services of a business center, to create a substantial likelihood of confusion.

The similarity of the goods cuts in favor of Network.

The relationship between the parties' channels of trade cuts in favor of Network.

The classes of prospective purchasers cuts in favor of Executive. While the class of prospective purchasers is identical, they're sophisticated prospects and it is unlikely that such persons would be confused as to the source of the goods and services in question.

The evidence of actual confusion cuts in favor of Executive.

The intention of Mr. Keating in adopting the mark cuts neither way. On this record, the way this case has been tried, the Court cannot tell without speculating what Mr. Keating had in mind. While it's possible that he intended to rip off Network, Network fails on its burden of persuasion on this point.

Lastly, as to the strength of the mark, the Court finds that the mark is a suggestive mark with descriptive elements and that it has a secondary meaning, a secondary meaning with favorable connotation for the goods, the real property, and the services provided by Network.

Based on a balancing of all of these findings, the Court ultimately rules that there is no legally cognizable likelihood of confusion by the use of the term "Executive Headquarters" in the manner in which Executive is using that term.

This case is far from frivolous. Network is properly seeking to enforce its mark and has invested a great deal in doing so. This case would be different, markedly different, if any one of the following three things were to take place—and this is not an exhaustive list: If the letters HQ were used in any advertising of Executive's, no matter how prominent the words "executive" or "executive headquarters" were displayed relative to the abbreviation HQ; second, if the word "headquarters" was used by Executive in any way more prominent than the word "executive"; and, lastly, if a horizontal line above or below either of the words "executive" or "headquarters" or both, in whatever color, was used by Executive in close proximity to either of those words.

In the absence of evidence of a likelihood of actual confusion, however, judgment on these claims must enter for Executive.

SO ORDERED.